SACHS, District Judge.
 

 Over a period of several years, Barclays American/Business Credit, Inc. (Barclays), as successor in interest to Aetna Business Credit, Inc., loaned substantial sums of money to A & C Johnson Co. (A & C). The loans were calculated as a percentage of inventory, which ranged from $1.3 to $1.7 million, and were secured by A & C’s accounts receivable. Proceeds from the accounts were to be deposited in a special “collateral” account maintained by A & C. Long, president and majority stockholder in A & C, was also guarantor on the loans. A & C and Long both filed for bankruptcy and Barclays now seeks to prevent discharge of debts resulting from Long’s guaranty by alleging (1) misconduct in obtaining some $90,000 worth of additional loans by inflating inventory valuation and (2) misconduct in diverting $139,120.97 worth of collateral (i.e. accounts receivable proceeds) to a new corporate account. Long used the diverted proceeds for attorneys’ fees and other expenditures to keep A & C functioning as an active business, an effort which quickly failed when Barclays refused further credit while A & C was in Chapter 11 reorganization.
 

 The case was heard by Bankruptcy Judge Kenneth G. Owens, who died prior to rendering an opinion. By consent of the parties, Bankruptcy Judge Robert J. Kres-sel decided the case on the written record, and allowed discharge of the debt in a reported opinion.
 
 In Re Long,
 
 44 B.R. 300 (Bkrtcy.D.Minn.1983). On review in the district court, Judge Diana E. Murphy affirmed in an unreported opinion. We also affirm.
 

 I. ALLEGATIONS OF FRAUDULENT BORROWING
 

 Barclays contends that A & C obtained excessive loans by misrepresenting the value of its inventory. The allegation concerns the financial condition of A & C and is thus governed by 11 U.S.C. § 523(a)(2)(B).
 
 [1]
 

 
 *877
 
 Barclays contends that it relied on representations that A & C’s inventory was valued at “cost or market, whichever is less.” These representations appeared in a footnote to a 1979 financial statement and also in monthly certifications supplied by A & C. There was testimony, however, that it was A & C’s practice to establish a cost for an inventory item when the item was originally purchased. If additional quantities of the item were purchased later, the new quantities were entered into the computer records but the per item cost of the original purchases became the assigned or constructive cost of the new purchases. Assuming that this method of record keeping was actually used, as the bankruptcy judge found, there was an inherently inflationary effect on the valuation of inventory on any occasions when items were purchased at discounted prices. Thus, when A & C purchased 30,000 rolls of wallpaper at a discount of some 90%, its assigned cost was the supplier’s full list price of $5.50 per roll, the price at which A & C had previously purchased 15-17,000 rolls of the same item.
 

 Although the parties discuss the issue as though it involved an erroneous use of market valuation, that does not seem to be the case. Barclays essentially contends that A & C was representing that its inventory was carried at
 
 actual
 
 cost for each item, and that the use of a constructive cost, based on the list price of the same type of merchandise, was a fraudulent misrepresentation.
 

 Apart from the accounting issues raised, there is no showing that the inventory as a whole was overvalued for going-concern purposes. On the other hand, large portions of the inventory (including that carried at actual list-price cost) seem to have been overvalued for liquidation sale purposes. Barclays asserts a total loss of approximately $550,000, and other creditors have also suffered major losses.
 

 Discharge is barred under § 523(a)(2)(B) only if, inter alia, the debtor acted with an “intent to deceive.” 11 U.S.C. § 523(a)(2)(B)(iv). The bankruptcy judge, as well as the district judge, found that Barclays failed to prove Long acted with the requisite intent. 44 B.R. at 310. Despite Barclays’ request for what amounts to de novo review, the lower courts’ findings, even though not based on observation of witnesses, are binding upon this court unless clearly erroneous.
 
 Anderson v. Bessemer City,
 
 — U.S. -, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 See also In re Hunter,
 
 771 F.2d 1126 (8th Cir. August 20, 1985) (reaffirming the clearly erroneous standard of review for bankruptcy judge decisions). Recognizing that the factual inferences are debatable,
 
 [2]
 
 Barclays does not convince us that the findings below are clearly erroneous.
 

 Barclays also argues that the bankruptcy judge should have been reversed because he relied excessively on the noninvolvement of Long personally in the corporate record-
 
 *878
 
 keeping or in the monthly certifications. A subsequent decision of this court establishes a rule of responsibility for fraud perpetrated by the debtor’s agent if the debtor knew or should have known of the fraud.
 
 In re Walker,
 
 726 F.2d 452 (8th Cir.1984). Judge Murphy did consider the effect of the
 
 Walker
 
 case, and concluded that the bankruptcy judge’s findings sufficiently established that Long neither knew of nor should have known of fraud. We agree.
 
 Walker,
 
 unlike this case, involved the debt- or’s unincorporated business. His wife was clearly acting as his personal agent, while it is not at all clear that A & C employees were personal agents of Long. Moreover, Judge Kressel found no fraudulent conduct by any of A & C’s employees, and Barclays does not identify any employee whose personal misconduct allegedly exceeds that of Long. Absent such a contention, there is nothing to reevaluate in light of
 
 Walker.
 
 Long’s discharge from the debt to Barclays is not barred by fraud in borrowing.
 

 II. ALLEGATIONS OF DEFALCATION BY A FIDUCIARY
 

 Barclays contends that the channeling of income from a segregated “collateral” account to a corporate bank account, and the subsequent distribution, constitutes defalcation or fraud by a fiduciary, and therefore bars discharge of Long’s debts pursuant to 11 U.S.C. § 523(a)(4). The contention is founded on a document to which Barclays and A & C were parties, and in which A & C agreed to become trustee of an “express trust.” The corpus of the trust was to consist of moneys obtained from accounts receivable, which, were to be placed in a segregated bank account, payable to Barclays.
 

 It has long been established that the Bankruptcy Act reference to “fiduciaries” applies only to trustees of express trusts.
 
 Davis v. Aetna Acceptance Co.,
 
 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). Long, however, was not an express fiduciary because the document purportedly creating the trust named A & C, rather than Long, as trustee.
 
 See In re Levitan,
 
 46 B.R. 380, 386-87 (Bkrtcy.E.D.N.Y.1985). The Code does not reach constructive trustees, designated as such because of misconduct. We recognize that there are cases charging individuals, by virtue of their corporate officer status, with the corporation’s fiduciary duties.
 
 In re Interstate Agency, Inc.,
 
 760 F.2d 121, 124-25 (6th Cir.1985);
 
 Matter of Whitlock,
 
 449 F.Supp. 1383, 1390 (W.D.Mo.1978). To the extent these cases hold that a statute or other state law rule may create fiduciary status in an officer which is cognizable in bankruptcy proceedings, we agree.
 
 [3]
 
 We question, however, the propriety of imposing a corporation’s fiduciary duties on a stockholder-employee in the absence of such a local rule, and decline to do so outside the special contexts in which the doctrine arose.
 

 Moreover, even if Long personally had been named as trustee, or if we chose to impose the corporation’s fiduciary duties on him by virtue of his officer status, we hold that he was not a trustee in the “strict and narrow sense,” as required to bar discharge under § 523(a)(4).
 
 See Davis,
 
 293 U.S. at 333, 55 S.Ct. at 153. It is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes.
 
 Davis,
 
 293 U.S. at 334, 55 S.Ct. at 154. Under this analysis, many cases have held that the type of relationship which existed between
 
 *879
 
 A & C and Barclays is intrinsically more contractual than fiduciary.
 
 Davis,
 
 293 U.S. at 334, 55 S.Ct. at 154.
 
 In re Levitan,
 
 46 B.R. 380, 385 (Bkrtcy.E.D.N.Y.1985);
 
 In re Gallaudet,
 
 46 B.R. 918, 925 (Bkrtcy.D.Vt.1985);
 
 In re Miles,
 
 5 B.R. 458, 460 (Bkrtcy.E.D.Va.1980).
 

 We therefore agree with the courts below that Barclays cannot soundly invoke the fiduciary bar against discharge of Long’s obligation.
 

 III. ALLEGATIONS OF WILLFUL AND MALICIOUS CONVERSION
 

 The most challenging legal issue in this case is whether Long’s conduct should disqualify him from discharge by reason of willful and malicious conversion of Bar-clays’ property. The statutory bar against discharge for “willful and malicious conversion,” per se (former 11 U.S.C. § 35(a)(6)), was deleted in the current revision of the Bankruptcy Code, but has been reinstated by interpretation of Congressional intent in enacting 11 U.S.C. § 523(a)(6).
 
 In re Kimzey,
 
 761 F.2d 421, 424 (7th Cir.1985). Guided by the understanding that statutory exceptions to discharge are to be narrowly construed,
 
 Kimzey,
 
 761 F.2d at 424;
 
 In re Rahm,
 
 641 F.2d 755, 756-57 (9th Cir.),
 
 cert. denied sub. nom., Gregg v. Rahm,
 
 454 U.S. 360, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981), we preface our discussion of the exception’s applicability to Long with a brief survey of its judicial evolution and an attempt to clarify its elements.
 

 Prior to the enactment of the new Bankruptcy Code, the leading cases on willful and malicious injury in a bankruptcy sense were
 
 Tinker v. Colwell,
 
 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), and
 
 Davis v. Aetna Acceptance Co.,
 
 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).
 
 Tinker
 
 held that a “malignant spirit” was not an essential element of malice, but that any intentional act which is “wrongful in and of itself, and which necessarily causes injury ... may be said to be done willfully and maliciously.”
 
 Tinker,
 
 193 U.S. at 487, 24 S.Ct. at 509. Hence, the
 
 Tinker
 
 court found that “the law implies that there must be malice” in a debt resulting from “criminal conversation” with a judgment creditor’s wife.
 
 Id.
 
 at 490, 24 S.Ct. at 510. Justices Brown, White and Holmes dissented .without opinion.
 
 [4]
 

 In
 
 Davis,
 
 the debtor sold a car in which the creditor had a security interest without obtaining the contractually required consent.
 
 Davis,
 
 293 U.S. at 330, 55 S.Ct. at 152. Despite the conversion, the Court, speaking through Justice Cardozo, found the debt dischargeable absent “aggravated features.”
 
 Id.
 
 at 332-33, 55 S.Ct. at 153. It was thus established that a conversion of property (a simple interference with legal rights) is not enough in itself to prevent discharge of a debt. It has not been established, however, precisely what type of conduct is sufficiently egregious to constitute malice in this context. Moreover, a distinct tension has arisen between the requirement of “aggravated features” in
 
 Davis
 
 and language in
 
 Tinker
 
 which has been interpreted as applying a “reckless disregard” standard.
 
 [5]
 
 This tension has recently been particularly perplexing to bankruptcy courts in the category of cases involving breached security agreements.
 
 In re Kimzey,
 
 761 F.2d 421, 425 (7th Cir.1985).
 

 
 *880
 
 While variations in factual context explain some of the different results found in current cases, we agree with Barclays that two distinct approaches are emerging at the trial court level. One line of cases tends to view a breach of a security agreement, if knowingly done, as an obvious intentional harm to the
 
 legal
 
 rights of the creditor, and therefore rather easily characterized as “willful and malicious.”
 
 See, e.g., United Bank of Southgate v. Nelson,
 
 35 B.R. 766 (N.D.Ill.1983), and cases cited;
 
 Matter of Ries,
 
 22 B.R. 343 (Bkrtcy.W.D.Wisc.1982). Another line of cases treats the breach of the security agreement or similar arrangement as a “technical conversion” under the
 
 Davis
 
 case, and requires a stronger showing of malice or intent to harm than may simply be inferred from th/e breach.
 
 See, e.g., In re Cecchini,
 
 37 B.R. 671 (Bkrtcy.App. 9th Cir.1984);
 
 In re Gallaudet,
 
 46 B.R. 918 (Bkrtcy.D.Vt.1985) (citing cases);
 
 In re Levitan,
 
 46 B.R. 380 (Bkrtcy.E.D.N.Y.1985);
 
 In re Simpson,
 
 29 B.R. 202, 212-13 (Bkrtcy.N.D.Iowa 1983) (Thinnes, J.);
 
 Matter of Langer,
 
 12 B.R. 957 (D.N.D.1981) (Benson, Chief Judge);
 
 Matter of Graham,
 
 7 B.R. 5 (Bkrtcy.D.Nev.1980);
 
 In re Hodges,
 
 4 B.R. 513 (Bkrtey.W.D.Va.1980).
 

 The only pertinent ruling by a Bankruptcy Appellate Panel holds there must be “intent to cause injury” rather than merely an “intentional act which causes an injury.”
 
 In re Cecchini, supra,
 
 at 675.
 
 Cecchini
 
 was very recently cited as authoritative in a Tenth Circuit decision, ruling that mere reckless disregard of the rights of others would not suffice to prevent discharge of a debt under § 523(a)(6).
 
 In re Compos,
 
 768 F.2d 1155 (10th Cir.1985). Judge Timbers, sitting by designation, declined to give retroactive effect to legislation enacted in 1984 which specifically prescribed nondis-chargeability for debts incurred as the re-suit of injuries caused by driving while intoxicated.
 
 [6]
 
 Another appellate decision holds that a conversion justifying punitive damages under state law does not necessarily preclude discharge of the debt in bankruptcy.
 
 In re Held,
 
 734 F.2d 628 (11th Cir.1984). Per Chief Judge Godbold, the
 
 Held
 
 court wrote that the state court judgment may have been based on a finding of mere “reckless indifference to the rights” of the injured parties, and that this reflected the discarded Tinker-based rule.
 

 We are quite aware that there are many expressions of dissatisfaction with discharging debts incurred through intentional breach of security agreements, where the debtor’s intent to repay, and thereby prevent economic loss, has been shown to be unrealistic if not insincere. Such dissatisfaction was expressed in the recent case of
 
 In re Clark,
 
 50 B.R. 122 (Bkrtcy.D.N.D.1985), where the bankruptcy judge “overruled” the intent-to-harm standard of
 
 Hodges
 
 and later cases, as applied by a predecessor judge and affirmed by the district court in
 
 Matter of Langer,
 
 12 B.R. 957 (D.N.D.1981).
 
 [7]
 

 The difficulty which the lower courts are currently encountering in applying § 523(a)(6) seems attributable, at least in part, to the frequent failure to separately analyze the elements of malice and willfulness. Despite the general difficulty in applying the § 523(a)(6) exception, there is a virtual consensus of opinion that “willful,” standing alone, means intentional or deliberate.
 
 See, e.g., Matter of Morgan,
 
 22 B.R. 38, 39 (Bkrtcy.D.Neb.1982);
 
 In re Tanner,
 
 31 B.R. 338, 339 (Bkrtcy.S.D.Fla.1983). It is the definition of malice, or the disregard of it as a separate term, which has been troublesome.
 

 Congress tells us in § 523(a)(6) that malice and willfulness are two different char
 
 *881
 
 acteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors’ economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional “aggravated circumstances,” under
 
 Davis
 
 and its recent progeny.
 

 Having determined that a heightened level of culpability must be found, going beyond recklessness and beyond intentional violation of a security interest, we turn to the task of articulating a workable standard. The bankruptcy courts have frequently attempted to define this level of culpability by speaking in terms of intentional harm. Malice is thus being given a meaning more nearly coinciding with common usage. One perceptive case turns to the Restatement (Second) of Torts, § 8A, Comment b, and uses intentional harm as a requirement for the bar to discharge, with the qualification that the expected harm must be “certain or substantially certain” to occur.
 
 In re Fercho,
 
 39 B.R. 764, 766 (Bkrtcy.D.N.D.1984). The Restatement observes that this is a stricter test of fault than the standard of recklessness. It is also consistent with the previously quoted
 
 Tinker
 
 language, allowing a finding of malice when conduct
 
 “necessarily
 
 causes injury.” 193 U.S. at 487, 24 S.Ct. at 509 (emphasis added). This phrase in
 
 Tinker
 
 has apparently not been criticized in the recent cases. Until a better definition can be formulated for use in this context, we accept the Restatement definition as helping to focus inquiry in applying the statutory “willful and malicious injury” requirement. When transfers in breach of security agreements are in issue, we believe non-dischargeability turns on whether the conduct is (1) headstrong and knowing (“willful”) and, (2) targeted at the creditor (“malicious”), at least in the sense that the conduct is certain or almost certain to cause financial harm.
 

 This test seems to explain most of the recent cases favoring debtors when malicious conversion is alleged. - It is a standard that at least partially satisfies the complaint of secured creditors who have been “done wrong” that they are faced with almost impossible obstacles in asserting nondischargeability because of actual malice. While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent.
 
 [8]
 
 Use of objective information to ascertain intent to cause harm is by no means unfamiliar.
 
 Bogard v. Cook,
 
 586 F.2d 399, 412 (5th Cir.1978),
 
 cert. denied
 
 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979) (appraising official immunity defense);
 
 Hanke v. Global Van Lines, Inc.,
 
 533 F.2d 396, 400 (8th Cir.1976) (tort liability of moving company).
 

 Returning to the present facts, we believe that Long’s conduct was unquestionably “willful,” as that term is commonly understood and for bankruptcy purposes. Long acknowledges that he knew the diversion of funds to a corporate account rather than the “collateral” account was contrary to the contractual arrangement with Bar-clays. The breach of contract was thus a flagrant one, born of apparent desperation over the financial plight of A & C. The more serious barrier to Barclays’ claim is presented by the requirement that there be a finding of malice. There are more
 
 *882
 
 factors favoring Barclays than there were favoring the creditor in
 
 Davis.
 
 As found by the courts below, Long was gambling with Barclays’ property.
 
 [9]
 
 Long testified candidly that he knew he was breaking the contract with Barclays by diverting money from the collateral account. He does not contend he supposed Barclays would have consented to the diversion, even in light of his purported purpose of saving the business and preventing losses to all creditors, including secured creditors whose security might prove inadequate on forced liquidation. While there were arguably some expenditures for his personal benefit, insofar as losses were shifted to Barclays they resulted in further liability on Long’s guar-antys.
 
 [10]
 
 While Long admitted some “inadvertent” use of the diverted moneys, in that all was not used for the intended purpose of meeting “critical” corporate obligations, the admission apparently relates to items such as a $38 payment for an airline guide. Such expenditures are
 
 de minimis,
 
 considering the magnitude of the claim.
 

 Barclays questions the payment of $35,-000 to attorneys, allegedly for the aborted reorganization effort and other matters relating to the corporate bankruptcy. While the reorganization effort collapsed about two weeks after the transfers, the effort was not necessarily a sham or hopeless from the beginning. Long testified he hoped Barclays could be induced to financially support the reorganization. When this hope vanished, the effort collapsed. There is nothing inherently incredible in this explanation. There was no testimony disputing solicitation of Barclays by Long and his attorneys. Nor was there testimony showing that the attorneys’ fees were used for advice and assistance on Long’s personal affairs, as Barclays speculates.
 

 The bankruptcy court and the district judge were entitled to rely on Long’s undisputed testimony as to his intent to benefit Barclays and other creditors as well as himself.
 
 See, e.g., Matter of Citizens Loan & Sav. Co.,
 
 621 F.2d 911, 913 (8th Cir.1980). If the business could have been saved, Barclays could have benefitted by hundreds of thousands of dollars. While Long may have committed a tort, and his conduct must be disapproved, we are not convinced that there was error below in ruling that he did not act maliciously, as that term is used in this context. ;
 

 Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge. If Congress wishes to tighten or redefine the nondischargeability rule in question, it can amend the Code as it did last year to prevent discharge from drunk driving damages.
 

 The judgment below is affirmed.
 

 [1]
 

 . The debtor in this case is Long. The debtor whose financial condition was allegedly misrep
 
 *877
 
 resented is A & C. There is no allegation and no finding that A & C was an alter ego of Long's. There is authority, however, as noted by Judge Kressel, making an individual debtor responsible for a misrepresentation benefitting his corporation. 44 B.R. at 308. Barclays also asserts the debt should not be discharged by virtue of 11 U.S.C. § 523(a)(2)(A). Sections 523(a)(2)(A) and 523(a)(2)(B) are, however, expressly mutually exclusive. The only misrepresentations alleged are those regarding the value of inventory which are "statements in writing respecting the debtor’s or an insider’s financial condition.” Section 523(a)(2)(A) is therefore inapplicable by its terms.
 

 [2]
 

 . It is certainly arguable that Long, who made the heavily-discounted purchase in question, and who presumably knew that the computer operator would simply add the volume of the new purchases to the existing inventory of higher cost merchandise, should have realized that this segment of the inventory would be given an artificially high "cost” valuation. Long testified, however, that he had many personal and business distractions at the time, and it would apparently have been unprecedented for him to suggest that the computer operators set up a special account for this particular discounted merchandise. Shortly after these purchases, the controller, whose awareness was presumably at least equal to Long’s, argued for an increase in inventory valuation by some $60,000 because the inventory as a whole had been given a "conservative” valuation.
 

 [3]
 

 . We are aware that many states, including Minnesota, statutorily define a corporate officer as a fiduciary with respect to the corporation and its shareholders.
 
 See
 
 Minn.Stat. § 520.01. Draining a corporation’s assets for the personal benefit of an officer may thus create a bar to discharge.
 
 John P. Maguire & Co.
 
 v.
 
 Herzog,
 
 421 F.2d 419 (5th Cir.1970), and cases therein cited. This is different, however, from making officers fiduciaries with respect to third party creditors, as Barclays would have us rule.
 

 [4]
 

 . Other language in the
 
 Tinker
 
 opinion has been the source of a rule that a "reckless disregard” of the rights of creditors will prevent discharge of the debt created by injurious conduct. It has been observed by a number of courts since the enactment of the new Bankruptcy Code that there is "legislative history underlying § 523(a)(6)” that has “made it clear that conduct which was merely reckless did not rise to the level of 'willful and malicious’."
 
 E.g., In re Adams,
 
 761 F.2d 1422, 1426 (9th Cir.1985).
 
 See
 
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 365; reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6320-21, expressing some disapproval of language in
 
 Tinker
 
 and stating that "to the extent that other cases have relied on
 
 Tinker
 
 to apply a ‘reckless disregard’ standard, they are overruled.”
 

 [5]
 

 .
 
 See supra
 
 note 4.
 

 [6]
 

 . The Ninth Circuit has, by contrast, given retroactive effect to the new legislation.
 
 In re Adams, supra.
 
 We need not deal with the conflicting results in those cases on the narrow issue of retroactivity, but we have already noted that
 
 Adams
 
 is consistent with
 
 Compos
 
 in requiring a very high level of personal misconduct, going beyond mere recklessness, before a debt is deemed nondischargeable for "willful and malicious injury."
 
 See supra
 
 note 4.
 

 [7]
 

 . We intimate no views on the final outcome of
 
 Clark,
 
 where the facts conceivably may sufficiently favor the creditor as to allow affirmance under the rule stated today.
 

 [8]
 

 . We have considered whether a remand should occur to allow Barclays to seek an express finding on the issue of Long’s willingness to inflict "substantially certain" injury. It is inherently unlikely, however, Long knew he was "throwing good money after bad,” despite the fact that he gave up hope in a matter of weeks. Moreover, Judge Kressel believed Long had not been shown to have "a willingness to voluntarily inflict injury.” While this formulation seems somewhat imprecise, it is probably unduly favorable to Barclays; and a remand does not seem appropriate under the circumstances.- The factual basis for the ruling is not clearly deficient, as explained below.
 

 [9]
 

 . We do have some doubt that a technical conversion occurred, as the money involved was payable to A & C for merchandise owned by A & C.
 
 See Matter of Banister,
 
 737 F.2d 225 (2d Cir.1984),
 
 cert. denied sub. nom., Wachovia Bank and Trust Co. v. Banister,
 
 — U.S. -, 105 S.Ct. 509, 83 L.Ed.2d 400 (1985), and
 
 Davis v. Aetna Acceptance Co.,
 
 293 U.S. at 330, 55 S.Ct. at 152, where the Supreme Court was untroubled by the bankrupt’s breach of an agreement to remit the proceeds of the sale in question. The courts below did not deal with this question of state law, and we assume arguendo there was a conversion.
 

 [10]
 

 . This distinguishes the situation in
 
 John P. Maguire & Co. v. Herzog,
 
 421 F.2d 419 (5th Cir.1970), where the corporate officer, Herzog, was apparently not a guarantor of debts to a floor-plan creditor. It will be further observed that the district court in that case found no "willful and malicious injuries," so the ruling somewhat favors Long on the point presently being considered. In certain of the bankruptcy cases cited, moreover, some personal or family gain from the conversion has been held not to preclude a discharge.