**In the Matter of Robert HARRIS and Barbara Harris, Debtors.**

**AMERICAN CHARTER FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

**v.**

**Robert HARRIS and Barbara Harris, d/b/a Western Nebraska Produce, Defendants.**

**Bankruptcy No. BK87–00755. Adv. No. 87–00279.**

United States Bankruptcy Court, D. Nebraska.

June 22, 1989.

Richard P. Garden, Jr.

David C. Nuttleman.

## MEMORANDUM OPINION [1]

JOHN C. MINAHAN, Jr.,
Bankruptcy Judge.

Plaintiff, American Charter Federal Savings and Loan Association, brought this action to establish an exception to discharge under 11 U.S.C. § 523(a)(6). This section excepts from discharge any debt incurred from a "willful and malicious" injury. American Charter asserts that the debtors, Robert Harris and Barbara Harris, sold property in which American Charter had a duly perfected security interest and used the proceeds in violation of the agree-

ment between American Charter and the debtors. The issue before the court is whether debtors' caused "willful and malicious" injury to American Charter by the unauthorized sale of collateral and use of proceeds.

## FINDINGS OF FACT

For several years prior to the filing of this bankruptcy case, Robert Harris had been in the business of growing, processing, and selling onions. In 1985, American Charter made a loan to the debtors, Robert and Barbara Harris. The debtors signed a Security Agreement granting American Charter a security interest in farm products to secure payment of all their present and future obligation. American Charter had a duly perfected security interest in the debtors' onion crop.

During the Fall of 1985, Robert Harris was authorized by American Charter to sell onions and utilize the proceeds for purposes other than making payments to American Charter. Myron Chappel, a former loan officer of American Charter, authorized the sale of onions. The consent to use proceeds was discontinued on November 8, 1985. From November 8, 1985 to September 18, 1986, American Charter consistently demanded that all proceeds from the sale of onions be applied to the indebtedness of the debtors to American Charter.

On November 8, 1985, the debtors were advised by American Charter that "[a]ll income must be applied against your loan. These funds can be reborrowed according to the cash flow or as agreed upon by American Charter." On December 6, 1985, the debtors were reminded that "[a]ll proceeds from the sale of the onions should be applied against your loan with American Charter and if need be redisbursed according to your cash flow. Would you please start sending any checks you receive for the sale of the onions to American Charter."

On January 6, 1986, Robert Harris was advised by American Charter that eighty percent of the proceeds from the 1985 onion crop must be applied to the debt at American Charter. This was confirmed by correspondence from American Charter to

---

**1.** This is an Amended Memorandum Opinion.   The original version was withdrawn.

Mr. Harris dated January 14, 1986, wherein it was made clear that American Charter insisted that it was absolutely necessary that all onion proceeds be paid to American Charter.

On January 6, 1986, the debtors executed a new note payable to American Charter. The debtors also executed a loan agreement which provided that the note would continue to be secured by the Security Agreement dated May 3, 1985. After January 6, 1986, various arrangements were made for the repayment of the loan, none of which resulted in the application of significant proceeds from the sale of the 1985 onion crop to the indebtedness. Robert Harris admitted that only $15,200.00 of the proceeds from the sale of the 1985 crop was applied to the indebtedness to American Charter. The rest of the proceeds of the 1985 crop were used for ordinary living expenses and for operating expenses. There was a significant shortage in the 1985 onion crop due to severe freeze.

The January 6, 1986 Note became due on April 15, 1986. American Charter agreed to forbear collection on the Note in order to allow the debtors to apply for a Small Business Administration ("SBA") disaster loan. After the completion of harvest of the 1985 crop, the debtors attempted to obtain the SBA Economic Disaster Loan to refinance the American Charter debt and provide operating funds for the 1986 crop year. Robert Harris advised American Charter by correspondence dated May 30, 1986 that he had made arrangements with his creditors to "hold off payments until the SBA loan *or harvest is complete*." (emphasis supplied). The SBA loan application was not approved. The debtors requested additional operating funds for 1986 from American Charter. Although American Charter refused to advance any additional funds, the debtors were able to plant an onion crop in 1986. The debtors raised money through personal family loans and from income generated by custom work performed by Robert Harris. The debtors were also able to obtain financing from suppliers and landlords for a portion of their expenses for the 1986 crop year. For example, fertilizer was obtained and se-cured by a fertilizer lien, and Dill Farms, one of debtors' landlords, was granted a security interest in the 1986 onion crop to secure debtors rental obligation.

Robert Harris understood that American Charter continued to have a security interest in the 1986 onion crop. An August 8, 1986 telephone conversation between Robert Harris and Kurt Grosshans, an American Charter employee, confirmed this understanding. Further, Mr. Grosshans advised Robert Harris that American Charter was looking to the 1986 crop for repayment of the debt. During the course of the conversation, Mr. Grosshans agreed to allow Robert Harris to sell transplanted onions to Delicious Foods, which had agreed to include American Charter as a payee on any checks issued for the crop. Mr. Grosshans did not authorize the sale of the 1986 onion crop to any buyer other than Delicious Foods.

On August 28, 1986, Robert Harris advised Mr. Grosshans that the transplants had produced 10,500 bags of onions, and that 1,650 bags had been shipped to Delicious Foods. Robert Harris failed to tell Mr. Grosshans that 8,241 bags of onions had been shipped to other purchasers. Mr. Grosshans' notes of the conversation reflect that Mr. Grosshans was concerned about the 8,241 bags of onions.

On August 29, 1986, Mr. Grosshans learned that Robert Harris had sold onions having a value of $23,000.00 to an "Omaha broker," and that sales had been made to Tom Lange Company. These sales were not authorized by American Charter.

On September 9, 1986, Mr. Grosshans traveled to Scottsbluff, Nebraska to inspect the debtors' onion crop. Robert Harris showed various fields of onions to Mr. Grosshans.

By a letter of September 18, 1986, American Charter demanded payment of its debt, or alternatively, that the debtors turn over all collateral, including farm products. Robert Harris received the letter and understood its contents. On that same date, American Charter retained Scottsbluff attorney Richard Douglas as local counsel to

represent American Charter on the Harris loan.

On September 23, 1986, Robert Harris contacted Mr. Grosshans by telephone in response to the September 18, 1986 letter. Robert Harris told Mr. Grosshans that if American Charter was going to take the entire 1986 crop and its proceeds, he, Robert Harris, would not harvest the crop. Mr. Grosshans suggested that it would not be in anyone's interest to let the crop go unharvested and encouraged Robert Harris to harvest the crop.

During the course of the September 23, 1986 telephone conversation, Robert Harris and Mr. Grosshans agreed that it was essential that the 1986 onion crop be harvested. It was agreed that Robert Harris would harvest the crop, place the onions in storage, and obtain scale tickets to verify the quantity of onions in storage. It was further agreed that once the crop was harvested, Robert Harris and Mr. Grosshans would meet in Scottsbluff, Nebraska, to negotiate a settlement of the debt to American Charter. American Charter took no further action to take possession of the 1986 onion crop.

Mr. Grosshans' file notes in connection with the Harris debt reflect the understanding reached during the telephone conference of September 23, 1986. These notes provide:

> Rob (Harris) called me about the demand letter. I told him we wanted to realize some repayments from the 1986 crop and issuing the demand letter was part of the process we will be using. He informed me the crop was still in the field and he would not finish harvesting if we wanted 100 percent of the proceeds. I told him that would be foolish but he could do whatever he wanted to. I agreed not to take any legal action until the crop is harvested. He said he will have scale tickets and possibly could get an inventory loan from Commerce Savings if we would settle at a reduced amount (i.e., $50–$75,000). I agreed to meet with both Rob and his attorney in Mr. Douglass' office as soon as harvest has been completed. We would then determine our next action. Rob said he has discussed bankruptcy with his attorney.

Mr. Grosshans testified that American Charter could have hired a farm manager or other individual to complete the harvest of the 1986 onion crop. He stated that American Charter chose not to do so based on Mr. Grosshans' understanding that the crop would be placed in storage after harvest.

American Charter wanted Robert Harris to harvest the 1986 crop and use his expertise in selling the crop. However, I specifically find that Robert Harris agreed to harvest and store the 1986 onions. American Charter did not consent to the sale of any of the 1986 onions except for the sale to Delicious Foods.

On October 30, 1986, Mr. Grosshans learned that Mr. Harris had been selling the 1986 onion crop in breach of the September 23, 1986 agreement. Mr. Grosshans directed local counsel to sue the debtors.

By correspondence of November 28, 1986, American Charter placed purchasers of the 1986 crop on notice of American Charter's lien in the crop. American Charter was able to recover $38,185.75 in proceeds of the 1986 crop. A settlement agreement was subsequently reached between First State Bank of Scottsbluff, J.R. Simplot Company, and American Charter to divide the proceeds received. As a part of the settlement agreement, the First State Bank assigned its security interest in farm products to American Charter.

Throughout 1986, American Charter was aware that the debtors had no operating loan to enable them to pay labor, fuel, utilities, costs of bags or any other necessities for planting, harvesting, processing and selling the 1986 crop. In his proposal of August, 1986 to American Charter, Robert Harris advised Mr. Grosshans that he had committed to pay his labor from the proceeds received from the 1986 crop. The cash flow statement that was submitted by Robert Harris to American Charter later in August, 1986, showed that approximately $140,000.00 of the proceeds of the 1986 crop would be used by Robert Harris to

complete the harvest, storage, processing and sale of that crop. Robert Harris estimated that, after the payment of expenses, there would be approximately $45,000.00 of proceeds remaining from the 1986 crop for payment on the American Charter debt.

American Charter provided no financing for the 1986 crop and it had knowledge that the only source of funds for paying the approximate $140,000.00 in necessary expenses would be the proceeds of the 1986 crop. American Charter stood by while other parties provided financing for the 1986 crop. Then on September 18, 1986, American Charter sent a letter to Mr. Harris demanding the benefit of the entire 1986 crop.

After the September 23, 1986 conference with Mr. Grosshans, Robert Harris completed the harvest, which took until approximately October 10, 1986. Robert Harris then telephoned Mr. Grosshans to discuss the disposition of the crop. Mr. Harris was told that Mr. Grosshans would no longer discuss the matter since American Charter had retained legal counsel, Richard Douglas. Robert Harris then contacted Mr. Douglas and discussed Mr. Harris' attempts to obtain alternative financing. Mr. Douglas did not tell Robert Harris to discontinue selling the crop.

American Charter argues that Robert and Barbara Harris caused willful and malicious injury by unauthorized sale of the 1986 onion crop and the use of proceeds. American Charter claims $132,610.50 in damages, calculated as follows:

| | |
|---|---|
| Fair Market Value of 1986 Crops | $179,595.02 |
| Less Onions Not Owned by Debtors | $  3,182.50 |
| Less Amount Received by American Charter & Other Creditors from Proceeds | $ 38,185.75 |
| Less Payment on J.R. Simplot Co. Secured Claim | $  3,296.27 |
| Less Payment to Dill Farm Claim | $  2,320.00 |
| TOTAL | $132,610.50 |

American Charter asserts that injury was caused by debtor's payment of crop proceeds of $132,610.50 to the other creditors.

The fair market value of the 1986 onion crop was $179,595.00 and the entire crop was sold by Robert Harris. Proceeds of the 1986 crop were used exclusively for the necessary living expenses of Robert Harris and his immediate family and for the payment of bills that arose in connection with the planting, harvesting, processing and selling of the 1986 onion crop and costs and expenses necessary and incidental thereto. Proceeds in the amount of $137,090.38 were used to pay for labor, rent, equipment, taxes, supplies and utilities. These actual expenses were consistent with the August 1986 projections of Robert Harris wherein he advised American Charter that projected expenses for the 1986 onion crop would be $140,000.00.

## CONCLUSIONS OF LAW

■ Under § 523(a)(6), an injury caused by "willful and malicious" conduct is not dischargeable. The decisional law interpreting the "willful and malicious" standard is disparate and difficult to reconcile. The Eighth Circuit Court of Appeals has enunciated a test for determining whether the willful and malicious standard is met in cases involving the sale of collateral in violation of security agreements. *In re Long*, 774 F.2d 875 (8th Cir.1985). The test was derived from the Restatement (Second) of Torts and held that injuries caused by the sale of collateral in violation of the terms of a security agreement are not dischargeable if the conduct is:

1. headstrong and knowing ("willful"), and

2. targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm.

*See Id.* at 881.

■ The willful element of § 523(a)(6) is not completely satisfied by finding that the *conduct* of the debtor was merely voluntary or intentional. Rather, the "willful" element is not satisfied unless the resulting *injury* is willful. The fact that the conduct or act of the debtor was voluntary or intentional is a necessary element of the statutory requirement that there be a willful injury. However, to be "willful" the conduct must also be "headstrong and know-

ing." *See In re Long*, 774 F.2d at 880. *See also In re Cecchini*, 37 B.R. 671 (Bkrtcy.App. 9th Cir.1984). Although the recent decision of the eighth circuit in *Hartley v. Jones (In re Hartley)*, 869 F.2d 394 (8th Cir.1989) *vacated*, 874 F.2d 1254 (8th Cir.1989) (en banc) held similarly, that decision was vacated and the judgment reversed upon reconsideration en banc by an evenly divided court. Therefore, *Hartley* was not relied upon in reaching my conclusions of law.

■ As has often been stated, mere reckless disregard for the rights of others is not a basis for barring discharge respecting injuries caused by the reckless conduct. *See In re Long*, 774 F.2d at 881. I conclude that "willful" as used in § 523(a)(6) means that the debtor engaged in voluntary or intentional conduct intending injury or knowing that injury would be caused thereby.

■ In the context of the conversion of collateral in violation of the terms of a security agreement, an injury is "willful" if the debtor voluntarily sold or otherwise disposed of the collateral knowing that the disposition violated the legal rights of the creditor and, at the time of the disposition, the debtor intended or knew that the disposition would cause injury to the economic or financial interest of the creditor.

■ A separate question concerns whether the "willful injury" constitutes a "malicious injury." If the conduct of the debtor is willful and it causes injury, discharge is barred on the claim only if the injury is "malicious." In the context of the sale of collateral without the consent of a secured party, the injury is malicious if the conduct of the debtor is "targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm." *See Id.* at 881. In *Long*, the eighth circuit stated that:

"We are convinced that if malice, as it is used in Section 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interests and expec-

tations, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice absent additional aggravated circumstances under Davis (*Davis v. Aetna Acceptance Co.*, 293 U.S. 328 [55 S.Ct. 151, 79 L.Ed. 393] (1934)) and its progeny."

*In re Long*, 774 F.2d at 881. In order to determine whether particular conduct caused a malicious injury, it is necessary for the trial court to consider the circumstances of the particular case.

## MRS. BARBARA HARRIS

■ The court concludes that Mrs. Harris did not cause a willful and malicious injury to American Charter. Mrs. Harris was a party to the agreements with American Charter and the agreements were violated. However, there is no evidence from which I would conclude that the breach of agreements were due to her conduct. There is no evidence that collateral was converted by her. Nor is there any evidence that her husband acted on her behalf or as her agent, or even that she received the benefits of any conversion of the property of American Charter. The acts and omissions of Robert Harris may not be imputed to Barbara Harris by virtue of their marital status. There is no evidence from which I conclude that Mrs. Harris willfully and maliciously caused injury to American Charter. I conclude simply that she was a party to agreements with American Charter, that the agreements were breached and that the debt due American Charter has not been paid.

Judgment should therefore be entered in favor of Mrs. Harris. Her obligation to American Charter should not be excepted from the discharge entered in this case.

## MR. ROBERT HARRIS
### 1985 CROP

■ The 1985 onion crop was sold by Mr. Harris with the consent and permission of American Charter. However, in January of 1986, Mr. Harris agreed to turnover eighty percent of the proceeds he received from the sale of the 1985 crop to American Charter. He failed to so turnover the pro-

ceeds, and this was in violation of the legal rights of American Charter. This was also injurious to the economic and financial interest of American Charter.

The failure to turnover the proceeds of the 1985 crop was done voluntarily and knowingly. Mr. Harris was aware of his legal obligations and his agreement to turnover the proceeds of the 1985 onion crop to American Charter and he failed to do so. However, Mr. Harris did not intend to injure American Charter by the sale and use of proceeds.

There is no evidence from which I will conclude that the failure of Mr. Harris to turnover the proceeds of the 1985 crop was "targeted" at American Charter. The failure to turnover the proceeds of 1985 crop was not certain or almost certain to cause financial harm to American Charter. Mr. Harris hoped to repay American Charter from the proceeds of the 1986 crop or alternatively from the proceeds of a new loan. Mr. Harris used the proceeds to pay crop expenses. He hoped to remain in the onion farming business and his conduct was referable to a desire to pay his debts to American Charter from the 1986 crops or from alternate financing which he actively pursued. In addition, Mr. Harris suffered significant crop loss in 1985.

The voluntary conduct of Mr. Harris concerning the 1985 crop and its proceeds was in violation of the legal rights of American Charter and the conduct was injurious to the economic and financial interest of American Charter. However, I conclude that the conduct of Robert Harris did not cause a willful and malicious injury to American Charter.

*1986 CROP*

■ In the sale of the 1986 onion crop and the use of proceeds, Robert Harris engaged in voluntary and intentional conduct which violated the legal rights of American Charter and the conduct was injurious to the economic and financial interest of American Charter. Mr. Harris intentionally and voluntarily sold the 1986 onion crop and, at the time, he had knowledge that the sales and application of proceeds were in violation of the legal rights of

American Charter. At the time of the sales of the 1986 onion crop and at the time Robert Harris used the proceeds of sales to pay creditors other than American Charter, Robert Harris knew that his conduct would cause financial injury to American Charter. The "willful" requirement of § 523(a)(6) is therefore fulfilled with respect to the 1986 crop and crop proceeds. Robert Harris caused willful injury to the economic and financial interest of American Charter.

The second element of the two-step test to be applied under *In re Long* involves a determination of whether there was a malicious injury. Here the factual issue concerns whether or not the conduct of Mr. Harris was "targeted" at American Charter, at least in the sense that the conduct was certain or almost certain to cause financial harm. A determination of malice also involves a consideration of aggravating and mitigating circumstances.

Mr. Robert Harris knowingly violated the legal rights of American Charter and he did so knowing that his conduct was likely to cause harm to the economic or financial interest of American Charter. However, the particular facts and circumstances of this case lead me to conclude that the conduct of Robert Harris was not malicious. The approximate $130,000.00 which American Charter seeks to have declared nondischargeable was used by Robert Harris to pay creditors who had extended new value to enable Robert Harris to plant, grow and harvest the 1986 crop.

When the time came for Robert Harris to pay his bills from the proceeds of the 1986 crop he was short of funds. Mr. Harris did not have sufficient funds to pay all creditors who had financed the crop and to make payments to American Charter. He had a difficult choice. Mr. Harris elected to pay the creditors who had extended new value for the 1986 crop year. His conduct was not "targeted" at American Charter. His motivation was a good faith desire to pay other creditors. Mr. Harris believed that the other creditors were entitled to be paid before American Charter was paid. Although the payment of the proceeds of the 1986 crop to various creditors was in

violation of the legal rights of American Charter, I conclude, as a matter of fact, that the conduct of Mr. Harris did not cause a malicious injury.

Under the facts and circumstances of this case it was arguably equitable for Robert Harris to first pay creditors who had extended new value to produce the 1986 crop. Although American Charter's legal rights were senior to the legal rights of such creditors, basic principles of equity favor the payment of creditors who extended new value. This basic equitable principle is recognized in U.C.C. § 9–312(2) and in 11 U.S.C. § 552(b). Section 552 permits duly perfected security interests in certain after-acquired property to be limited based upon the equities of a case. Under this provision, a duly perfected security interest may be subordinated to creditors who extend new value. Similarly, U.C.C. § 9–312(2) recognizes that creditors who extend new value to enable a debtor to produce a crop may be entitled to priority over the holder of a preexisting lien. Of course, U.C.C. § 9–312(2) and 11 U.S.C. § 552 are not applicable to this case. The creditors who extended new value do not claim a purchase money security interest in the 1986 crop and § 552 has no application to these prebankruptcy transactions. However, these statutes recognize a principle that is quite germain. Mr. Harris' conduct and testimony was consistent with his recognition of equities which favored creditors that extended new value. Robert Harris' decision to pay the proceeds of sale was motivated by his belief that they should be paid first. His conduct was not targeted at American Charter. His conduct was targeted at the creditors who received payments and his conduct, although not legally justifiable, was consistent with principles recognized in equity. After weighing all the circumstances of this case, I conclude, as a matter of fact, that the injury caused to American Charter was not malicious.

For the reasons stated, I conclude that the actions of Robert Harris in connection with the sale and disposition of the 1985 and the 1986 crop and its proceeds did not cause a willful and malicious injury. Ac-

cordingly, the plaintiff's claim for an exception to discharge should be denied.

The separate judgment previously entered (Fil. # 21) is consistent herewith and shall remain in full force and effect.