In re Michael Allen HANSON, Debtor.

Theresa FISCHER, Plaintiff,

v.

Michael A. HANSON, Defendant.

Bankruptcy No. 4–93–3992.

Adv. No. 4–93–430.

United States Bankruptcy Court, D. Minnesota.

Sept. 9, 1994.

Thomas G. Wallrich, Fafinski & Wallrich, P.A., Minneapolis, MN, for plaintiff.

Joseph A. Wentzell, Johnson & Wentzell, Ltd., Minneapolis, MN, for debtor/defendant.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on June 7, 1994. Thomas G. Wallrich appeared for the plaintiff and Joseph A. Wentzell appeared for the defendant.

This court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and Local Rule 201. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## ISSUE

The issue presented by this proceeding is whether the plaintiff's claim for damages as a result of the transmission of a sexually transmitted disease is excepted from the defendant's discharge. Because I find that the

defendant's conduct was both willful and malicious, I conclude that the plaintiff's claim against the defendant is nondischargeable under 11 U.S.C. § 523(a)(6).

## FACTUAL BACKGROUND

Michael Hanson and Teresa Fischer first met on July 6, 1990 at a bar in Billings, Montana. Hanson, a resident of Minnesota, was vacationing in Montana and Fischer lived and worked in Billings. On the night of the sixth, Fischer received a call at home from friends, inviting her to join them in a local bar. Fischer's friends introduced her to Hanson that night and the two found themselves mutually attracted to each other and a relationship quickly developed.

Later that night, Fischer and Hanson returned to his motel room where they engaged in sexual intercourse. Sadly, Fischer was unaware that Hanson had the Human Papilloma Virus, the virus that causes Condyloma or genital warts. Hanson, however, knew that he had contracted this virus as early as 1986. He had suffered active outbreaks of warts at various times since then and had been treated for warts approximately six times before meeting Fischer. In fact, Hanson realized that having sexual intercourse with someone while suffering an active outbreak of warts was the surest way to spread the disease; yet not only did he have sex with Fischer, he did not wear a condom nor did he warn her that she was at risk of contracting the Human Papilloma Virus.

Condyloma is a particularly insidious disease transmitted by a biologic virus, the Human Papilloma Virus, or HPV. Condyloma usually manifests itself through the appearance of warts in and around the genital area, but HPV does not always cause warts and an infected person may have no symptoms of infection. Warts considered "visible" may also be so small as to be virtually imperceptible. Any appearance of refractory warts, however, is always preceded by HPV infection; there is no other possible cause of the warts.

The virus actually lives on the surface of skin in the genital area, including inside and outside the vagina, in the perineal area and around the groin area on males. Genital warts can also appear on the lips or in the mouth, if the virus is transmitted orally. Other symptoms of HPV can include cervical dysplasia (abnormal cervical cells), cervical cancer or penile cancer, and abnormal pap smears.

Genital warts are only transmitted sexually, either through intercourse or oral sex. Scientists and doctors are still uncertain exactly how the virus is transmitted but most agree that it is spread through sexual contact when the warts are detectable, although some contend it can be transmitted subclinically, even when the infected person has no apparent warts. Doctors invariably warn an infected individual that abstention from sex is the only guaranteed way to prevent transmission of the disease, although the use of condoms generally helps prevent spreading sexually transmitted diseases.

Hanson kept his disease hidden from Fischer the night they met and throughout their relationship. Disclosure by Hanson, or her own observation, was the only way Fischer could have learned about Hanson's infection. Since the warts are frequently too small to be discernible by an untrained eye, the only realistic way Fischer could have learned of his infection was by Hanson informing her. Hanson never wore a condom when he and Fischer had sex, even though condoms are inexpensive, easily available, and highly recommended protection against the spread of many sexually transmitted diseases, including genital warts. Hanson and Fischer never inquired about each other's sexual histories and discussed birth control only briefly, long enough for them to agree that Fischer would continue to use an oral contraceptive.

The day after their introduction, Hanson and Fischer decided to travel to Yellowstone National Park for a sightseeing excursion. From there, they went to Fischer's home where they again spent the night together and had sexual relations. Hanson then returned home to Minnesota but he and Fischer continued their relationship via the telephone and letters until they met again in Dickinson, North Dakota, halfway between their respective homes, in early August of

1990. They spent the weekend together and had sexual intercourse three or four times. Hanson continued to rely on Fischer's use of oral contraceptives to protect Fischer from pregnancy but he did nothing to protect her from his venereal disease. More importantly, Hanson never gave Fischer the opportunity of protecting herself, as he continued to hide his disease from her.

Hanson and Fischer next saw each other August 26, 1990, when Fischer traveled to Minnesota to spend a full week with Hanson at his home. They had begun discussing the possibility of one of them moving to be closer to the other and Fischer offered to open her home to Hanson should he choose to move to Montana. Although the relationship was clearly developing into something more serious, Hanson still hid his disease from Fischer and made no attempt to protect her from contracting HPV and never let her protect herself.

Sometime in October of 1990, Hanson left his job in Minnesota and moved to Montana to live with Fischer. Hanson arrived on October 28, moved his belongings into Fischer's home and began to search for work. Even though Hanson had difficulty finding a job, and remained unemployed until February, Fischer allowed him to live in her home while she paid all the utility bills, the mortgage, and any other incidental bills. While their relationship had seemingly developed into a trusting and committed partnership, Hanson continued to hide his disease from her.

In December, Fischer went to her gynecologist for a routine examination. In previous years, her pap smears and other tests had always been normal and she had no serious gynecological problems. This pap smear was abnormal, however. This manifestation of HPV occurred five months after Fischer and Hanson first had sex, close to the normal HPV incubation period of three to four months. Doctors were unable to identify the source of Fischer's abnormal medical tests until June of 1991, and Hanson offered nothing to aid them in their search.

Coincidentally, December was the first time Fischer noticed anything physically amiss with Hanson. In the course of oral sex, Fischer felt a bump on Hanson's penis and asked if there was anything wrong. Hanson brushed aside her concern, claiming the bump was an old scar[1] and nothing more. Fischer, taking her partner at his word, thought nothing more of the seemingly innocuous bump until it was too late.

Hanson left Fischer in May to live with another woman he had met at work. Fischer was left with an empty home and the accumulated bills from Hanson's extended stay. In June, Fischer was informed by her physician that Hanson had left her something else: an infectious disease she will carry the rest of her life. Her doctor said her abnormal pap smears had been traced to an HPV infection and that a sexual partner must have given it to her. Hanson, when confronted with the news, finally admitted to his disease.

Hanson's behavior is shocking, to say the least. He continually misled Fischer by hiding his infection from her, even though they were living together, she was supporting him, and they were presumably building toward a future together. Hanson, having gained Fischer's trust and confidence, betrayed her by failing to wear a condom, to take any other precautions against transmission, or to warn Fischer that she could eventually contract his disease. Finally, on the one occasion when Fischer asked him about a visible wart, expressing her concern in the midst of an act as intimate and personal as one can imagine, Hanson responded with yet another lie.

## LEGAL ANALYSIS

■ The plaintiff, Teresa Fischer, seeks to have the damages caused by her genital warts infection determined to be a nondischargeable debt under 11 U.S.C. § 523.[2] The issue before this court is whether a debt

---

1. At trial, Hanson testified that he thought the bump was a blood blister.

2. Fischer's action in Montana state court was stayed by Hanson's bankruptcy. This proceeding is to determine dischargeability, not damages. Liquidation of damages will await further action in state court.

caused by the transmission of a sexual disease should be considered nondischargeable under § 523(a)(6) as a "willful and malicious injury" where the defendant failed to warn the plaintiff that he suffered from the communicable disease.

The Eighth Circuit delineated the factors required to prove a 523(a)(6) claim, at least for purposes of conversion, in *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985). In *Long*, the Eighth Circuit held that transfers in breach of security agreements are nondischargeable when the debtor's conduct is "headstrong and knowing ('willful') and targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.* at 881.[3]

In *Hartley v. Jones*, 874 F.2d 1254 (8th Cir.1989) (en banc), the Eighth Circuit again examined the dischargeability of a willful and malicious injury. The court affirmed the ruling of the district court that, in some instances, an injury "substantially certain" to result from a debtor's conduct is nondischargeable as a willful and malicious injury.

As a joke, Hartley had thrown a lit firecracker into an unventilated basement where the plaintiff was using gasoline to clean used tires for resale. The firecracker ignited the amassed fumes, caused an explosion and a fire, and severe burns to the plaintiff. The district court borrowed dicta from *Long* to show that the likelihood of harm from a debtor's actions may be evaluated objectively under § 523(a)(6) to show an intentional injury. *See Hartley v. Jones*, 100 B.R. 477, 479 (W.D.Mo.1988). The *Hartley* court found that the debtor's act of throwing the firecracker was substantially certain to ignite the gasoline fumes and create a fire that would injure the plaintiff. Relying on the *Restatement of Torts*, the court in *Hartley* reasoned that an intentional act substantially

certain to cause an injury met 523(a)(6)'s requirements of willful and malicious. *Id.* at 480. The plaintiff therefore met the Eighth Circuit's objective test for the likelihood of harm due to an intentional injury. *Id.*

▄▄▄ Hanson argues that he did not intend to give Fischer HPV and therefore his actions were neither willful nor malicious. While there is evidence to the contrary,[4] this argument is beside the point. Hanson focuses on the wrong event. While it certainly is the transmission of the virus that ultimately resulted in Fischer's damages, the proper focus of the dischargeability analysis is on Hanson's failure to tell Fischer that he had HPV and that she might get it from him.

The Eighth Circuit has cautioned that § 523(a)(6) has two parts and that it is the plaintiff's burden to show that an injury is both willful and malicious. *Long*, 774 F.2d at 880. In an attempt to be helpful, the Eighth Circuit further attempted to define what constituted willfulness and what constituted maliciousness. While those definitions are much cited, they, in large part, beg the question and leave a court no further ahead in dealing with the words willful and malicious themselves. This is compounded by the fact that the Eighth Circuit attempted to limit these definitions to transfers in breach of security interests. *Id.* at 881. However, courts have frequently ignored that distinction in an attempt to apply the definitions where they do not fit very well. This is partly the problem faced by the court in *Hartley*, 874 F.2d at 1254.

▄▄▄ Were Hanson's actions willful? Of course they were. He intentionally had sexual relations with Fischer while at the same time intentionally withholding from her the fact that he had HPV and withholding from her information that he possessed regarding the manner in which it is transmitted. Hanson's actions were thus willful in the common

---

3. While *Long* is one of the Eighth Circuit's most detailed explications of what constitutes willful and malicious injury, courts must be careful in transplanting the analysis of a financial tort to an analysis of a personal one.

4. Fischer testified that when she told Hanson that she had been diagnosed with genital warts,

he told her that he knew she would get them and that he should have given her some of the articles he had about the disease. Fischer also testified that Hanson told her that he got them from his former girlfriend and that he gave them to Fischer for revenge.

sense that he did them all intentionally and willful in the sense used by the Eighth Circuit in that it was a knowing, headstrong action on his part.

 Were Hanson's actions malicious? They were. His actions were obviously targeted at Fischer in that he had sex with her and he kept important information from her. It was Fischer's right to make an informed decision about whether or not she wanted to have sexual relations with Hanson. It is her body that would be affected by the numerous consequences of such a decision, and Hanson's withholding that information from Fischer out of his wellfounded fear that she would decide not to have sex with him if she had appropriate information makes Hanson's actions malicious. They were targeted at her.[5] That his actions were malicious is born out by the fact that under the guise of loving her, he accepted her hospitality by way of a place to live and food to eat and what purported to be a romantic relationship while continuing to withhold this important information from her. On the one occasion when he did ask him about the bump on his penis, he lied to her.

### CONCLUSION

Since Fischer's damages from Hanson's transmission to her of the Human Papilloma Virus is the result of a willful and malicious injury, her claims for that injury are nondischargeable.

THEREFORE, IT IS ORDERED: The defendant's debt to the plaintiff resulting from the defendant's transmission of the Human Papilloma Virus to the plaintiff is excepted from the defendant's discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**5.** The Eighth Circuit's definition of malicious found in *Long* goes on to further define malicious by adding the phrase "at least in the sense that it is certain or almost certain to cause injury." However, this is in a sense a refinement of the phrase "targeted at the creditor." It is enough to show that the actions were in fact targeted at the creditor.