**In re Allen W. MOBERG, Debtor.**

**Lana DORER, Plaintiff,**

v.

**Allen W. MOBERG, Defendant.**

**Bankruptcy No. 4–91–744.
Adv. No. 4–91–178.**

United States Bankruptcy Court,
D. Minnesota.

July 26, 1993.

Richard A. Williams, Jr., Hvass, Weisman & King, Minneapolis, MN, for plaintiff.

Joseph W. Dicker, David J. Amesbury, Joseph W. Dicker & Associates, Minneapolis, MN, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for trial before the undersigned on the 10th day of May, 1993. Appearances were as follows: Richard Williams, Jr. for the plaintiff; and Joseph Dicker and David Amesbury for the defendant.

## FINDINGS OF FACT

1. The plaintiff, Lana Dorer ("Dorer"), was an employee of Metropolitan Reconstructive and Cosmetic Surgery, P.A. ("Metropolitan") at all relevant times.

2. The defendant, Allen Moberg ("Moberg"), was the principal of Metropolitan and the only physician employed by Metropolitan.

3. Moberg hired Dorer as an office administrator for Metropolitan so that he could spend more time in surgery and less time on administrative tasks. Moberg was Dorer's immediate supervisor.

4. In 1985, Moberg was attempting to open a clinic similar to Metropolitan in the state of New York. Moberg was in New York on the weekend prior to September 10, 1985 in furtherance of that purpose.

5. Sometime between 9:30 and 10:00 p.m. on September 10, 1985, Moberg called Dorer at her home asking her to meet him at David Fong's restaurant to discuss the events that occurred in New York. Dorer first declined to meet Moberg given the late hour, but Moberg insisted, telling Dorer that he would not have time to discuss the New York trip in the office the next day because he would be in surgery. Dorer eventually agreed to meet Moberg that night.

6. Moberg picked Dorer up in his jeep, and the two drove to David Fong's restaurant. Moberg ate dinner, but Dorer did not. Dorer had one drink while Moberg ate, and Moberg had a carafe of wine plus two additional glasses of wine. While Moberg ate, they discussed the events that occurred during Moberg's trip to New York and other business matters. They left the restaurant in Moberg's jeep shortly before it closed.

7. Rather than taking Dorer home, Moberg drove to his condominium, explaining to Dorer that he had documents that he needed to give her. When they reached Moberg's condominium, Dorer told Moberg that she would wait in the car while he got the documents for her. Moberg told Dorer to come into the condominium with him, and she did.

8. Once inside the condominium, Dorer excused herself to use the restroom, and asked Moberg to get her a soft drink while she did so. When she returned from the restroom, all of the lights in the condominium were turned off, and Moberg was sitting on the couch lighting a candle. Dorer asked Moberg what he was doing, and he told her that she knew what he was doing. Dorer sat down on a chair, and Moberg got up and attempted to kiss her. Dorer got up and moved to another chair, but Moberg followed her and again attempted to kiss her. She moved several more times, and Moberg repeatedly followed her. Dorer asked to leave during these events, but she does not recall Moberg's response. Dorer never attempted to leave and Moberg never physically prevented her from doing so.

9. Eventually, the two were in Moberg's bedroom, where Moberg held Dorer down on the bed while they had sex. Dorer physically acquiesced in the sexual act, but repeatedly told Moberg "no" and "it's wrong." Dorer has no recollection of how they got to Moberg's bedroom or how her clothing was removed. Moberg made no threat of physical harm, nor did Dorer perceive any such threat, although she did perceive his behavior to be aggressive. Her clothing was not torn and she sustained no physical injuries.

10. Moberg eventually fell asleep, at which time Dorer crawled to the restroom and vomited. She went to the living room to try to find Moberg's jeep keys, but could not find them because the room was too dark. She did not turn on the lights because she did not want to wake Moberg. Dorer eventually got her clothes from Moberg's bedroom, and waited on the couch in the living room until it was light enough for her to find Moberg's keys. When she did, she took his jeep and drove herself home.

11. Moberg called Dorer at home that morning and she explained that she had taken his jeep. Moberg told Dorer that he would not be coming into the office that day.

12. Dorer drove Moberg's jeep to the office later that morning. While there, she spoke with Moberg over the phone and arranged to exchange his jeep for her car. The cars were exchanged that afternoon at the Lincoln Del restaurant as planned. Dorer does not remember how Moberg got her car or her keys.

13. Dorer initially told no one about the events that occurred between she and Moberg on the night of September 10, 1985 because she was in shock. Two days later, Dorer spoke with her attorney about the incident. On the advice of her lawyer, she did not report the incident to the police, nor was she examined by a doctor.

14. A few days after the incident, Dorer, Moberg, and other employees of Metropolitan assembled to view an informational video that Dorer was producing for Metropolitan. At this time Dorer informed Moberg that the sexual act that had occurred was "wrong," and "bad," and "would not happen again." Moberg started drinking during the viewing of the video, and when it was finished he screamed at Dorer saying that she had done a "shitty job."

15. Moberg never spoke to Dorer in the office again after that outburst. He made her working conditions intolerable to the point where she went home sick one afternoon. Several weeks after September 10, 1985, Dorer received a late-night phone call from the bookkeeper of Metropolitan, informing her that she had been fired but giving no reason.

16. Dorer subsequently filed an Employee's Claim Petition with the Workers' Compensation Division of the Minnesota Department of Labor and Industry, and a Charge of Discrimination with the Minnesota Department of Human Rights. Both documents were based upon the events that occurred on September 10, 1985 and Dorer's subsequent termination.

## CONCLUSIONS OF LAW

■ 1. The plaintiff has the burden of establishing the nondischargeability of a debt under section 523(a)(6) by a preponderance of the evidence. *Johnson v. Miera*

(*In re Miera*), 926 F.2d 741, 744 n. 5 (8th Cir.1991).

2. A debt of an individual debtor is not dischargeable in chapter 11 if it is a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §§ 523(a)(6); 1141(d)(2).

■ 3. The Eighth Circuit Court of Appeals defined the terms "willful" and "malicious," as used in section 523(a)(6), in *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985). A willful act is one that is headstrong and knowing. A malicious act is one that is targeted at the creditor, at least in the sense that it is certain or substantially certain to cause injury. *Long*, 774 F.2d at 881.

■ 4. The Eighth Circuit Court of Appeals has twice clarified the application of the *Long* standard of nondischargeability to cases involving reckless tortious conduct. In both *Cassidy v. Minihan*, 794 F.2d 340 (8th Cir.1986) and *Hartley v. Jones (In re Hartley)*, 869 F.2d 394 (8th Cir.1989), the court held that a debtor's reckless disregard for the risks involved in his or her conduct does not render an injury that results from such conduct nondischargeable. *Cassidy*, 794 F.2d at 344; *Hartley*, 869 F.2d at 395. The standard applicable to tort liability, that an individual is liable for all foreseeable consequences of his or her acts, is not applicable in determining the dischargeability of a debt. *Hartley*, 869 F.2d at 395. Rather, the debtor must have actually intended to inflict injury upon the creditor, at least in the sense that the debtor acted in a headstrong manner knowing that injury was certain or substantially certain to flow from his or her actions. *Long*, 774 F.2d at 881; *Cassidy*, 794 F.2d at 344; *Hartley*, 869 F.2d at 395.

■ 5. Dorer has met her burden of proof. Moberg's behavior in the present case goes far beyond recklessness. At the time Moberg and Dorer had sex, Moberg knew from Dorer's actions and from her verbal protestations that she did not wish

to have sex. When Moberg attempted to kiss Dorer in the living room, she repeatedly moved to avoid his advances. During the sexual act, Dorer repeatedly said to Moberg "no" and "it's wrong." Moberg acted willfully because he proceeded to have sex with Dorer knowing that she did not wish to have sex with him, and he acted maliciously because the nonreciprocal sexual act was substantially certain to cause harm to Dorer.

6. This case is akin to *Johnson v. Miera (In re Miera)*, 926 F.2d 741 (8th Cir.1991) wherein the Eighth Circuit Court of Appeals concluded that a debtor had willfully and maliciously injured an employee by kissing the employee against his will. The court found:

> The trial evidence shows that [the debtor] was more than reckless when he kissed [his employee] because he *intended* to cause [his employee] harm. The evidence establishes that [the debtor] was certain or substantially certain that [his employee] would be harmed by an unwanted kiss. [The debtor] deliberately kissed [his employee] even though he was aware that [his employee] did not share his affections and that [his employee] would be harmed by the offensive contact.

*Miera*, 926 F.2d at 744 (emphasis in original). Here, Moberg knew that Dorer did not wish to have sex and that she would be harmed thereby.

 7. The facts that Moberg did not physically threaten Dorer, that Dorer did not attempt to leave, and that Dorer ultimately acquiesced in the sexual act do not affect my decision. The *Long* standard does not require physical brutality by the debtor, nor does it require that the creditor use every possible means to avoid the injury. *Long* simply requires headstrong and knowing behavior that is certain or substantially certain to cause injury, and that is exactly what happened in this case.

### ORDER FOR JUDGMENT

ACCORDINGLY, IT IS HEREBY ORDERED: Any debt owing from Moberg to Dorer arising out of injuries sustained by Dorer due to the sexual act that occurred on September 10, 1985 is adjudged to be nondischargeable.

LET JUDGMENT BE ENTERED ACCORDINGLY.