In re Kim E. LANE, Debtor.

CAPE COUNTY BANK, Plaintiff,

v.

Kim E. LANE, Defendant.

Bankruptcy No. 84–10129SE.
Adv. No. 85–1002SE.

United States Bankruptcy Court,
E.D. Missouri,
Southeastern Division.

Oct. 5, 1993.

Francis J. Siebert, Scott City, MO, for debtor/defendant.

Thomas A. Ludwig, Jackson, MO, for Bank.

William H. Frye, Cape Girardeau, MO, Trustee.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

1. The Plaintiff, Cape County Bank (the Bank), filed this adversary proceeding in which it asked the Court to:

(a) deny Kim Lane his discharge in bankruptcy,

(b) refuse to discharge the $15,000.00 debt Mr. Lane owed the Bank under a promissory note dated January 8, 1983, and

(c) refuse to discharge the $10,000.00 debt Mr. Lane owed the Bank under a promissory note dated April 6, 1983.

The Bank alleged that in selling the wheat that secured the $15,000.00 note and not surrendering the proceeds to the Bank, the Debtor violated 11 U.S.C. § 727(a)(2)(A). The Bank further alleged that Mr. Lane violated section 523(a)(2)(A) because, when applying for the $10,000.00 loan, he represented to the Bank that he owned an International Harvester "490" disc with harrow that, in fact, belonged to the Schneider Machinery Company.

2. The Debtor denied that he intended to hinder, delay or defraud the Bank in refusing to surrender the proceeds of the wheat that secured the $15,000.00 loan. He also denied

that he had misled the Bank in representing that he owned the "490" disc harrow. He maintained and was absolutely convinced that he owned this machine.[1]

3. The Court held a hearing on this matter. In addition to the allegations contained in his complaint, the Plaintiff's counsel, at trial, argued that the Debtor had violated 11 U.S.C. § 523, when he failed to surrender or hold for surrender a Kewanee grain auger and a John Deere "150" ditching blade that secured the $15,000.00 loan. Counsel also maintained that Mr. Lane violated 11 U.S.C. § 523 when he failed to maintain insurance on those two pieces of equipment despite this Court's order instructing him to maintain such coverage.

Furthermore, Cape County Bank argued at trial that Mr. Lane had misstated facts in testifying at the hearing on this matter and that the Court should, therefore, deny him his discharge under 11 U.S.C. § 727(a)(4). The Court, before concluding the hearing on this adversary matter, orally denied the Plaintiff's request for denial of the Debtor's discharge on the grounds provided in section 727(a)(4) of the Bankruptcy Code.[2]

*FACTUAL BACKGROUND*

After considering the entire record developed in these proceedings, including the testimony adduced at trial, the Court makes the following findings of fact.

1. On January 8, 1983, Kim Lane, in two transactions, borrowed $20,000.00 from Cape County Bank. In the first transaction, Mr. Lane borrowed $15,000.00 from the Bank and, as collateral, granted the Bank security interests in some of his property, including: a Kewanee grain auger, a John Deere "150" ditching blade, four life insurance policies he and his wife held and 150 acres of growing

wheat situated on four different farms. In the second transaction, Debtor, his wife and John P. Lichtenegger borrowed $5,000.00 from the Bank.[3] Mr. Lichtenegger granted the Bank a security interest in 40 acres of wheat growing on a farm he partly owned as collateral for this second loan.

2. Mr. Lane, on April 6, 1983, asked the Bank to lend him $10,000.00. Kent Puchbauer, an agricultural loan officer at the Bank, informed the Debtor that the Bank would not lend him $10,000.00 on an unsecured basis. Mr. Lane left the Bank and returned with a bill of sale from Schneider Equipment Company (Schneider) marked "paid" indicating that he owned an International Harvester "490" disc.[4] Mr. Puchbauer also testified that the Bank did not conduct a search of the U.C.C. filings to determine whether anyone held a security interest in the "490" disc.

This Court concluded in a prior, unpublished opinion that the "490" disc belonged to Schneider. In that opinion, the Court chronicled how Mr. Lane had purchased the "490" disc from Schneider on May 10, 1982 and resold it to Schneider on March 18, 1983. The Court also noted that, on April 15, 1983, Lane repurchased the "490" disc from Schneider and granted Schneider a security interest in the machine which Schneider perfected by filing a U.C.C. Financial Statement.

The Court's prior opinion stated that Lane testified that he believed that he had paid for the "490" disc in full when he endorsed a check from John Deere to Schneider sometime before April 15, 1983. Schneider, however, proved to the Court that the endorsed check was applied not to the debt created when the Debtor repurchased the "490" disc,

1. The Court, in deciding a motion for relief of stay in the underlying bankruptcy case, decided that Schneider Machine Company held a security interest in the disc harrow when the Debtor pledged that machine to the Plaintiff, Cape County Bank.

2. The Court indicated that it did not believe that the Debtor had intentionally testified falsely. Though his testimony might differ from that of another witness or otherwise be proven to be incorrect, that alone does not warrant the denial

of a discharge under section 727(a)(4) which requires a showing of an intent to testify falsely.

3. Mr. Lichtenegger testified that Kim paid the proceeds of this loan to him as the down payment on a farm he was buying from Mr. Lichtenegger.

4. The Bank did not produce this document or a copy of it at trial. Mr. Puchbauer testified that, in 1983, it was not the Bank's practice to retain copies of such bills of sale.

but to the debt he incurred in 1982 when he first purchased the machine. The Debtor, in the earlier proceedings, referred to some cashier checks which he had used to pay Schneider for the "490" disc before April 6, 1983 but he did not substantiate these references with documentation or other evidence, leading the Court to comment that it had "little choice but to conclude that Schneider Equipment Co., Inc. perfected its lien on the disc in question when it filed its U.C.C. documents on April 19, 1983 at Perry County, Missouri."

At the hearing on this adversary, the Debtor again testified that he owned the "490" disc on April 6, 1983 when he pledged it to Cape County Bank as collateral for the $10,000.00 loan.

3. Kim Lane and John Lichtenegger, in two other transactions, borrowed $12,000.00 from the Bank. On February 24, 1983, Cape County Bank extended $9,000.00 of unsecured credit to Lane and Lichtenegger. Then, on May 6, 1983, the Bank, on an unsecured basis, loaned the pair $3,000.00.

4. Kim Lane sold his interest in 107 acres of soy beans to John Lichtenegger, Paul Ehlert and John Fred Seabaugh (the buyers) on August 12, 1983. The buyers paid Mr. Lane $19,937.50 on the date of the sale and agreed to pay him $2,000.00 more when he combined the crop. The buyers borrowed the purchase price from Cape County Bank.

The Bank issued a check payable to Kim Lane and John Lichtenegger. Mr. Lane testified that he endorsed the check and surrendered it to Mr. Lichtenegger's secretary. The Debtor testified that he, John Lichtenegger, and Kent Puchbauer had arranged to have the proceeds of the bean sale applied to the balances he owed on the $15,000.00 and $10,000.00 notes and that when he surrendered the check to Mr. Lichtenegger's secretary he thought the proceeds would be so applied. Mr. Puchbauer testified that the Debtor indicated to him that he would use the proceeds of the sale of his bean crop to pay the amounts he owed the Bank on the loans he had taken for his wheat crop (the

$15,000.00 loan and the $10,000.00 loan) but he also testified that the Debtor had never specifically asked him to apply the proceeds of the bean sale to the wheat loans. Mr. Puchbauer further testified that he communicated the Debtor's intention to apply the money he would receive for his bean crop against the amounts he owed on his wheat crop to Mr. Van Pulson, another loan officer at the Bank who arranged the loan the buyers used to purchase Mr. Lane's bean crop.

Mr. Lichtenegger testified that he did not know of the $15,000.00 loan Mr. Lane had taken from the Bank when he agreed to buy the bean crop. He further testified that he and the Debtor had agreed that the proceeds of the bean sale would be used to extinguish the balances owed to the Bank on the notes John had co-signed and to pay some debts Mr. Lane owed, with the remainder to be surrendered to Mr. Lane. In fact, the proceeds were applied as Mr. Lichtenegger testified he and Kim had agreed.

5. The Debtor harvested the wheat that secured the Bank's $15,000.00 note and sold it for between $6,500.00 and $7,000.00.[5] A week or ten days after selling the wheat, Mr. Lane went to the Bank with the sale proceeds. At this time Mr. Lane learned that the proceeds of his bean crop had been applied to the notes that Mr. Lichtenegger had co-signed, not the notes he executed to finance his wheat crop.

During that visit to the Bank, Mr. Lane paid the interest due on the $15,000.00 note and tried to borrow more money but Mr. Puchbauer refused to lend more to him. Upset about the how the Bank had applied the proceeds of the bean sale and dismayed that the Bank would not lend him more money, the Debtor refused to surrender the remaining proceeds of the wheat sale and left the Bank with those funds. Kim Lane testified that he used the remainder of the sale proceeds to pay other business-related debts he owed, including the rent he owed those from whom he leased his fields.

5. Only 90 of the 150 acres produced or yielded any wheat. The Debtor could not attest to the actual sale price at trial because the records of

this sale were not in his possession but were in the custody of his former spouse.

6. On September 18, 1984, in response to the Bank's Motion For Relief From Stay the Court by written order, ordered the Debtor to maintain adequate insurance on the auger and ditching blade that secured the Bank's $15,000.00 note. If the Debtor failed to maintain the insurance, the automatic stay would be lifted without further notice upon application of the Bank. Later the parties entered a stipulation and the Court ordered the stay lifted with respect to the auger and ditching blade on January 15, 1985.

The Debtor did not maintain insurance on the auger and ditching blade and, despite Mr. Puchbauer's instruction to deliver the ditching blade and auger to one of three equipment retailers, he never surrendered the equipment to the Bank or to any agent of the Bank. Instead, the Debtor called Mr. Puchbauer and informed him that he had found buyers willing to purchase the auger and ditching blade for $1,500.00 each. These sales were never completed.

By the date of the hearing on this adversary, March 20, 1985, both the auger and ditching blade were missing from the Debtor's farm. Mr. Lane testified that he did not know where the auger and ditching blade were and that he had last seen them months earlier on his farm.[6] Kim Lane suggested that some neighbors might have borrowed the equipment. William Lane, the Debtor's father testified on March 21, 1985 that neither piece of machinery was on his son's farm. William Lane further testified that he had last seen the auger on Kim's farm in October of 1984 and that he had last seen the ditching blade at his son's farm in February of 1985. The Debtor's father suggested that Nick Bruckerhoff had taken the Kewanee grain auger from Kim's farm. The Debtor also suggested that Mr. Bruckerhoff possessed the auger and admitted that he had told Mr. Bruckerhoff that he could use the auger during the summer of 1984 and might have given him permission to use it after the hearing before this Court when he was ordered to surrender the auger to the Bank.

6. At the time of the hearing, the Debtor was living at his parents' farm, not his farm.

7. From the evidence adduced at the trial of this matter the Court cannot determine whether the

## DISCUSSION

*Charge Relating to the $10,000.00 Loan:*

The Court will first consider the Bank's allegations that the Debtor violated section 523(a)(2)(B) of the Code when, in procuring a $10,000.00 loan from the Bank, he represented that he owned an International Harvester "490 disc." Section 523 of the Bankruptcy Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive; or

11 U.S.C. § 523(a)(2)(B).

The Bank argues, first, that the Debtor knew that he did not own the "490" disc when he showed Mr. Puchbauer the bill of sale. Second, that the Bank reasonably relied on that written statement of ownership in deciding to lend Mr. Lane $10,000.00 on April 6, 1983. Third, the Bank claims and this Court previously found that Mr. Lane did not own the "490" disc on that date. Such conduct, the Bank maintains, violated section 523(a)(2)(B).

To authenticate his claim of ownership, the Debtor showed Mr. Puchbauer a bill of sale indicating that he had paid for the "490" disc.[7] The bill of sale was materially false because it showed that Mr. Lane owned the "490" disc when, in fact, he did not. The Bank relied upon this written statement in

Debtor showed Mr. Puchbauer the bill of sale from the first time he purchased the "490 disc" or the bill of sale from when he repurchased the machine from Schneider Equipment Company.

deciding to extend credit to Mr. Lane.[8] However, the Bank did not prove that the Debtor intended to deceive the Bank when he represented that he owned the "490" disc.

A previous decision of this Court recounted the ownership history of the "490" disc. In short, Schneider Equipment initially sold the "490" disc to the Debtor. Schneider then repurchased the machine, only to later resell it to the Debtor.

The Debtor twice testified before this Court that he owned the "490" disc and referred to checks he had signed over to Schneider the second time he purchased the machine which he believed fully paid for the "490" disc. Given the potential for confusion arising from the repeated changes in the ownership of the "490" disc, the Court finds that the Debtor could reasonably have believed and I find that he actually believed that he owned the machine on April 6, 1983 when he presented the bill of sale purportedly documenting his ownership to Mr. Puchbauer. The Bank did not offer any proof to show that Mr. Lane knew he did not own the "490" disc. The Court holds that Mr. Lane did not possess an intent to deceive the Bank when he, by written statement, represented that he owned the "490" disc. Without an intent to deceive, there can be no violation of section 523(a)(2)(B), hence, the Court will deny the Bank's request for relief under that section.

*Charges Relating to the $15,000.00 Loan:*

■ The Bank has also asked the Court to deny Mr. Lane his discharge under section 727 of the Bankruptcy Code. The Bank cites various instances of misconduct by the Debtor which it maintains constitute violations of section 727. The Bank's primary charge of misconduct involves Mr. Lane's use of the approximately $6,500.00 he derived from the sale of his wheat crop in which the Bank held a security interest. The Bank's other allegations of misconduct regard Mr. Lane's failure to account for or carry insurance on the grain auger and ditching blade that secured the $15,000.00 loan the Bank made to him.

As recounted above, Mr. Lane sold the wheat crop in which the Bank held a security interest and failed to surrender the proceeds, approximately $6,500.00, to the Bank. Mr. Lane did not waste or hide the proceeds of the wheat sale but used the bulk of them to pay debts he owed to other creditors of his business.

The Bank also complains that it never recovered the auger and ditching blade from Mr. Lane. These items served as additional security on the $15,000.00 loan the Bank made to the Debtor. Mr. Puchbauer, the Bank's agricultural loan officer who testified at the trial on this matter stated under oath that a price of $1,500.00 each for the auger and blade would have been fair in 1983. Mr. Puchbauer inspected these items and stated that in his capacity with the Bank he has become generally familiar with the prices of farm equipment. The Court finds his estimate of the values of the blade and auger to be credible.

The total value of the auger, blade and wheat which all secured the $15,000.00 debt to Cape County Bank was, at most $13,000.00 ($1,500.00 for each piece of equipment and $7,000.00 for the wheat). The Bank alleges that the Debtor, in applying the proceeds of the wheat to his other debts and in not taking steps to prevent the auger and blade from disappearing, violated sections 727(a)(2)(A) and (B) of the Bankruptcy Code. Section 727(a) of the Code instructs a Court to deny a Debtor his discharge in bankruptcy when:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition;

---

**8.** The Bank did not conduct a search of the county records for U.C.C. filings against the "490 disc." The Court makes no ruling whether such an omission renders the Bank's reliance unreasonable because such a determination is not necessary to today's decision.

11 U.S.C. §§ 727(a)(2)(A) and (B). In applying section 727(a)(2), courts have noted that the section seeks to protect the rights of unsecured creditors. *In re Hoffman,* 70 B.R. 155, 160 (Bankr.W.D.Ark.1986); *In re Ellefson,* 54 B.R. 16 (Bankr.W.D.Wisc.1985); *In re Harris,* 8 B.R. 88, 90–91 (Bankr. M.D.Tenn.1980). Denying a debtor his discharge because he transferred fully-encumbered property would not further the goal of protecting unsecured creditors because the fully-encumbered property would not have been available to satisfy the unsecured creditors' claims. *In re Hoffman,* 70 B.R. 155, 160 (Bankr.W.D.Ark.1986); *In re Ellefson,* 54 B.R. 16 (Bankr.W.D.Wisc.1985); *In re Harris,* 8 B.R. 88, 90–91 (Bankr.M.D.Tenn. 1980). In support of their position, these courts have pointed to the language of section 727(a)(2) which refers to property of the estate and property of the debtor and reason that when property is fully-encumbered it is neither property of the debtor before filing nor property of the estate after the debtor files his petition. *In re Hoffman,* 70 B.R. 155, 160 (Bankr.W.D.Ark.1986); *In re Ellefson,* 54 B.R. 16 (Bankr.W.D.Wisc.1985); *In re Harris,* 8 B.R. 88, 90–91 (Bankr. M.D.Tenn.1980). This Court agrees that a debtor's transfer or misuse of fully-encumbered property does not warrant denying him his discharge under section 727 of the Bankruptcy Code because such an act does not harm the unsecured creditors whom the section seeks to protect. The Court will not deny Mr. Lane his discharge pursuant to section 727 of the Bankruptcy Code.

The Bank, at trial, indicated that Mr. Lane's use of the proceeds of the sale of the wheat in which it held a security interest and his failure to take better care of the auger and ditching blade provided cause for this Court, under section 523, to deny the discharge of the $15,000.00 debt he owed the Bank. The Bank's counsel did not specify which subsection of section 523 these acts of the Debtor violated but the Court presumes he intended to rely on section 523(a)(6).

Section 523(a)(6) excepts from discharge "any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;" 11 U.S.C. § 523(a)(6). The Eighth Circuit Court of Appeals has directed lower courts applying section 523(a)(6) to separately analyze the elements of willfulness and malice. *In re Long,* 774 F.2d 875, 880–81 (8th Cir.1985). The *Long* court held that malice contemplates conduct "more culpable than ... [conduct that is] ... merely in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights." *Id.* at 881. The Circuit Court further discussed malice, stating that, "knowledge that legal rights are being violated is insufficient to establish malice, absent some 'aggravated circumstances' ..." The Circuit Court then enunciated a standard, saying, "[w]hen transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.*

Having established a standard against which to evaluate cases under section 523(a)(6), the Eighth Circuit applied that standard to the facts of *Long.* The debtor in *Long* knowingly violated the terms of a security agreement he had with his lender when he paid the expenses of a failed reorganization with money that, under the agreement, should have been deposited in a collateral account established to protect the lender. 774 F.2d at 876. The Eighth Circuit noted that though the debtor had acted willfully in not depositing the funds in the collateral account, he had not acted with malice. *Id.* at 881–82. The *Long* Court recognized that in trying to reorganize, the debtor was "gambling with" the lender's money but it emphasized that the debtor's reorganization was not a "sham or hopeless [effort]" and that had the debtor's efforts proved successful, the lender would have benefitted. *Id.* at 882. The Court concluded its opinion with the observation that "[d]ebtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge." *Id.*

In this case, as in *Long*, the Debtor intentionally misapplied property in which a creditor held a security interest. Like Mr. Long, Mr. Lane used the vast majority of the funds in which his creditor, the Bank, had an interest to further his business. Mr. Lane did not intend to harm the Bank and harm to the Bank was not inevitable, for if Mr. Lane had been able to procure financing for his next crop and generate a profit he could have repaid the amount he owed the Bank. The Court finds that the Debtor did not act with malice in misapplying the proceeds of his wheat crop.

The Bank did not present any evidence to the Court proving that Mr. Lane had sold or hidden the grain auger or ditching blade. Instead, it asserted and the Debtor and his father agreed that these items simply had disappeared from the Debtor's farm before the Bank could take possession of them. Testimony indicated that farmers in the region often borrowed equipment from one another and Mr. William Lane and his son, the Debtor, suggested that Mr. Bruckerhoff had borrowed the grain auger. From the evidence before it, the Court can neither determine where the auger or ditching blade went nor find that the Debtor willfully and maliciously acted to effect a conversion of these items. The Court will also deny the Bank's request, based on Debtor's alleged failure to care for the auger and ditching blade, for an exception from discharge for the $15,000.00 debt.

The Bank offers Debtor's failure to procure insurance coverage for the auger and ditching blade, following an order of this Court instructing him to do so, as a final ground for excepting the $15,000.00 loan from discharge. The Court entered an order on September 18, 1984 denying Cape County Bank's request for relief from the automatic stay provided the Debtor satisfied certain conditions. One condition to the Court's order was that the Debtor "maintain adequate insurance coverage upon the property [the blade and grain auger], maintain the property in good repair, and permit the Bank's representatives to inspect the said property at reasonable times." The order continued, saying:

"[i]f the Debtors should fail to comply with any of the foregoing requirements, upon the Bank's application and without further hearing on the merits of this matter, the Court will enter an order modifying the automatic stays under 11 U.S.C. 362(a) to permit the Bank to enforce its application according to the terms of its various security agreements and to applicable law."

By the Order's terms, relief from the automatic stay was the Bank's remedy for Debtor's failure to carry insurance. Neither the Debtor nor the Bank presented any evidence explaining why the Debtor failed to procure insurance covering the blade and auger. The record does not indicate whether the Debtor failed to insure the equipment because he lacked the financial resources to do so or whether he willfully opted to ignore this Court's instruction. The Court will not impose a sanction so harsh as exception of a large debt from discharge on as incomplete a record as this. The Bank's request that the Court except the $15,000.00 debt from discharge because the Debtor did not insure the auger and ditching blade will be denied.

An Order consistent with this Memorandum Opinion will be entered this date.

### ORDER

For the reasons set forth in the Memorandum Opinion filed this date, IT IS

ORDERED that:

(1) Cape County Bank's request that the Court deny Debtor his discharge for alleged violations of 11 U.S.C. Section 727 of the Bankruptcy Code IS DENIED; and

(2) Cape County Bank's request that the Court except the $10,000.00 and $15,000.00 debts owed to it from discharge for alleged violations of 11 U.S.C. Section 523 IS DENIED.