**In re David S. PHILPOTT, Debtor.**

**John Hunter, Harvey Swift, Tom Lambert, Ivan B. Williams, William H. Noble, and A.J. Morrison, as Trustees of the Mid–South Iron Workers Welfare Plan; Mid–South Iron Workers Welfare Plan; Daniel Navarre, John Hunter, Harvey Swift, Frank Lanier, Jerry Wilson, Robert Troquille, Phil Dozier, Richard Maples, Donald Denese, and Larry Savell, as Trustees of the Iron Workers Mid–South Pension Fund; Iron Workers Mid–South Pension Fund; John Hunter, Harvey Swift, Tom Lambert, Ivan B. Williams, William H. Noble, and Alfred Dean, as Trustees of the Oklahoma Iron Workers Direct Contribution Plan and Trust; Oklahoma Iron Workers Direct Contribution Plan and Trust; Oklahoma Iron Workers Apprenticeship & Training Fund, Local 584, Plaintiffs,**

v.

**David S. Philpott, Defendant.**

**Bankruptcy No. 5:00–bk–81191.**

**Adversary No. 5:01–bk–8002.**

United States Bankruptcy Court, W.D. Arkansas, Fayetteville Division.

July 31, 2002.

Kelly F. Monaghan, Tulsa, OK, for plaintiffs.

Stephen L. Taylor, Springdale, AR, for defendant.

Jill R. Jacoway, Fayetteville, AR, trustee.

## Memorandum Opinion

ROBERT F. FUSSELL, Bankruptcy Judge.

Plaintiffs John Hunter, Harvey Swift, Tom Lambert, Ivan B. Williams, William H. Noble, and A.J. Morrison, as Trustees of the Mid–South Iron Workers Welfare Plan; Mid–South Iron Workers Welfare Plan (the "Welfare Plan"); Daniel Navarre, John Hunter, Harvey Swift, Frank Lanier, Jerry Wilson, Robert Troquille, Phil Dozier, Richard Maples, Donald Denese, and Larry Savell, as Trustees of the Iron Workers Mid–South Pension Fund; Iron Workers Mid–South Pension Fund (the "Pension Fund"); John Hunter, Harvey Swift, Tom Lambert, Ivan B. Williams, William H. Noble, and Alfred Dean, as Trustees of the Oklahoma Iron Workers Direct Contribution Plan and Trust; Oklahoma Iron Workers Direct Contribution Plan and Trust (the "Direct Contribution Plan"); and Oklahoma Iron Workers Apprenticeship & Training Fund, Local 584, (the "Apprenticeship Fund") (collectively "Plaintiffs") filed their complaint instigating this adversary proceeding on January 12, 2001.

Plaintiffs' complaint alleges that Plaintiffs are entitled to a non-dischargeable judgment against David S. Philpott, the debtor and defendant ("Defendant"), pursuant to 11 U.S.C. § 523(a)(4). The parties have stipulated to the relevant facts in this matter, and have agreed to submit this matter to the Court for a final judgment based on the stipulations and briefs on file.

Based on the stipulated facts and briefs on file, and pursuant to 11 U.S.C. § 523(a)(4), the Court holds that Plaintiffs are entitled to a non-dischargeable judgment against Defendant in the amount of

$84,471.67.[1] This amount includes interest at the stipulated contract rate through July 29, 2002, the date of judgment. Interest shall continue to accrue on the judgment at the federal judgment interest rate from the date of judgment until paid.

## I. Jurisdiction

The Court has jurisdiction to enter a final judgment disposing of all issues in the case pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The following opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. Procedural History

Defendant, together with his wife Lola M. Philpott, filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code on September 29, 2000.[2] On January 12, 2001, Plaintiffs filed their complaint instigating this adversary proceeding. Defendant filed his answer to Plaintiffs' complaint on February 22, 2001.

On December 17, 2001, Plaintiffs filed a motion for summary judgment and supporting brief. On January 22, 2002, Defendant filed a response to motion for summary judgment and supporting brief. Plaintiffs filed their reply to Defendant's response on February 19, 2002. The Court found that material issues of fact remained in the matter and denied the motion for summary judgment in an order entered March 12, 2002. A pre-trial order was also entered on March 12, 2002, setting a trial date of March 25, 2002.

Plaintiffs and Defendant filed their joint stipulations of fact on March 20, 2002, and Plaintiffs filed a pre-trial memorandum brief on the same date. On the day of trial, the parties appeared and agreed to a continuance, in hopes that additional time would allow them to stipulate to all relevant facts and submit the matter to the Court on stipulations and briefs.

On May 28, 2002, the parties filed their additional joint stipulations of. facts. The Court reviewed the pleadings and stipulations, and determined that additional fact issues remained. By letter dated June 28, 2002, the Court requested that the parties amend their additional joint stipulations of facts to resolve the remaining factual issues, and advised the parties that if the Court did not receive a stipulation of facts that resolved all factual issues before July 10, 2002, the case would be set for a full trial on the merits. The parties filed their amended additional joint stipulations of fact on July 10, 2002.

## III. Findings of Fact

The Court adopts and incorporates into this opinion the facts as set forth in the joint stipulation of facts, additional joint stipulation of facts, and amended additional joint stipulation of facts filed by the parties.

The following facts are contained in the joint stipulation of facts filed on March 20, 2002:

1. The Welfare Plan is a multi-employer welfare plan established for the purpose of providing medical benefits for employees of participating employers. The Welfare Plan is jointly administered by an equal

---

**1.** This amount reflects the parties' stipulated damages of $81,265.65 as of May 3, 2002, together with additional accrued interest from May 4, 2002, through July 29, 2002, the date of judgment, in the amount of $3206.02.

**2.** Lola M. Philpott was not named as a defendant in this adversary proceeding.

number of Trustees representing employers and representing employees, and is administered pursuant to the terms and provisions of its Restated Agreement and Declaration of Trust in accordance with ERISA.

2. The Welfare Plan is administered pursuant to the terms of the Collective Bargaining Agreements entered into by and between various participating local unions, including Local 584 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, and various employers and employer groups, including the Oklahoma Commercial & Industrial Builders & Steel Erectors Association, whose members employ iron worker employees.

3. The Apprenticeship Fund is a pooled fund established for the purpose of administering a training program providing training for Apprentice Iron Workers and retraining or refresher training for Journeymen Iron Workers.

4. The Pension Fund is a multi-employer employee pension fund established for the purpose of providing and maintaining pension benefits for employees of participating employers.

5. The Pension Fund is jointly administered by an equal number of Trustees representing employers and the Union, and is administered pursuant to the terms and provisions of its Restated Agreement and Declaration of Trust in accordance with ERISA.

6. The Pension Fund has also been established and is administered pursuant to the terms of the Collective Bargaining Agreements entered into by and between various participating local unions, including Local 48 and Local 584 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, and various employers and employer groups, including the Oklahoma Commercial & Industrial Builders & Steel Erectors Association, whose members employ individuals represented by one or more of these Unions.

7. The Direct Contribution Plan is a defined contribution plan as defined in ERISA, established by the Iron Workers and employers for the purpose of providing benefits to the employees.

8. The Direct Contribution Plan is jointly administered by an equal number of Trustees representing employers and the Union, and is administered pursuant to the terms and provisions of its Restated Agreement and Declaration of Trust in accordance with ERISA.

9. The Direct Contribution Plan is administered pursuant to the terms of the Collective Bargaining Agreements entered into by and between various participating local unions, including Local 584 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, and various employers and employer groups, including the Oklahoma Commercial & Industrial Builders & Steel Erectors Association, whose members employ Iron Worker employees.

10. Collective Bargaining Agreements were signed by Scott Manuel as Vice President on behalf of Quality Home Improvement & General Contracting, Inc., also known as Quality Home Improvements & General Contracts, Inc. ("Quality

Home"), on or about August 31, 1999.

11. Under certain circumstances, the Pension Fund, regardless of whether contributions are actually received from participating employers, may be obligated to provide pension benefits to a participant in the fund, thereby reducing benefits to those employees whose employer has remitted contributions to the Fund.

12. Under certain circumstances, the Welfare Plan may be required to pay benefits to a participant in the Plan, regardless of whether contributions have actually been received from the employer, thereby jeopardizing the financial solvency of the Plan to pay benefits to the other eligible employees.

13. The Direct Contribution Plan is funded entirely by employer's contributions and such contributions are applied to each individual participant's account. If the employer fails to contribute the contributions earned by the employee, the employee's account is not credited for those amounts, and such amounts cannot be recovered from sources other than employer.

14. Quality Home employed employees who are or were members of and/or represented by Local 584 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO and submitted contribution reports to the Plaintiff Funds for the months of November and December, 1999; and January and February, 2000.

15. Quality Home was an Arkansas corporation formed in 1997, and engaged in an industry affecting commerce and doing business within the State of Arkansas.

16. Quality Home changed its name to Global Contracting, Inc. ("Global"), in 2000. Global is the successor in interest to Quality Home.

17. Quality Home and Global were owned entirely and equally by Scott Manuel and David Philpott as sole shareholders.

18. Both Quality Home and Global were operated by two (2) corporate officers: David S. Philpott, President, and Scott Manuel, Vice President.

19. Philpott and Manuel were in charge of the day to day operations of Quality Home and Global, and both had the discretion to enter into contracts on behalf of the corporations.

20. Philpott and Manuel each had discretion to disburse corporate funds of Quality Home and Global and such decisions were made both individually and jointly.

21. On February 29, 2001, Quality Home issued eight checks drawn on the account of Quality Home, Simmons First Bank, Searcy, Arkansas, and signed by Manuel. The checks to the various Plaintiff Funds were for the amounts due per the contribution reports for contributions for November and December, 1999.

22. No contributions were received from Quality Home or Global for the months of January and February, 2000, or for any months thereafter.

23. On September 29, 2000, David S. Philpott filed his Voluntary Petition for Bankruptcy under Chapter 7, Case No. 00–81191–F.

24. David S. Philpott and Scott Manuel, as officers and sole shareholders of Quality Home and Global had the discretionary authority for the disbursement of corporate funds, including the obligation to remit contributions to the Plaintiff Funds owed on behalf of its employees.

25. That during the period November 1999 through April 2000, cash withdrawals were made from the account of Quality Home and Global, the specific purposes of which are unknown.

26. During the period November 1999 through April 2000, the following disbursements were made from the corporate account:

 (a) On February 1, 2000, Manuel issued check number 4003 on Quality Homes's checking account, Simmons First Bank, for $5,468.37, payable to Association National Bank, for the payment of a personal credit card in the name of Manuel;

 (b) On February 1, 2000, Manuel issued check number 4006 on Quality Home's checking account, Simmons First Bank for $2,523.02, payable to Citibank, for the payment of personal credit card in the name of Manuel;

 (c) On December 12, 1999, Philpott issued check number 3461 on Quality Home's checking account, Simmons First Bank, for $150.00, payable to Westside Church of Christ, for the building fund;

 (d) On February 18, 2000, Philpott issued check number 3991 on Quality Home's checking account, Simmons First Bank, for $172.77, payable to Southern Farm Bureau, for life insurance;

 (e) On March 3, 2000, Philpott issued check number 4397 on Quality Home's checking account, Simmons First Bank, for $179.89, payable to First Security Bank, for the payment of a note securing the personal truck of Philpott;

 (f) On November 11, 1999, Philpott issued check number 3267 on Quality Home's checking account, Simmons First Bank, for $350.00 payable to Simmons First, for "home loan."

27. During the period November 1999 through April 2000, Philpott and Manuel issued checks to themselves, on the Quality Home checking account, for various amounts in excess of $24,500.00.

28. Credits and benefits were provided by the Funds to Employees of Quality Home for all hours set forth in the Contribution Reports sent in by Quality Home, with the exception of the Direct Contribution Fund.

29. The Collective Bargaining Agreements require all Employer contributions to be paid monthly.

30. No contributions may be made by Employees to the Funds.

31. But for the payment of other expenses of the corporation, Quality Home had funds to pay all or a portion of the contributions to the Funds.

32. Cash disbursements of corporate funds were made to David Philpott.

33. Both Philpott and Manuel knew and understood that contributions were to be paid monthly to the Funds on behalf of Quality Home and employees.

34. The parties stipulate that the Mid–South Iron Workers Restated Agreement and Declaration of

Trust, previously filed with the Court as Exhibit 2, in Appendix to Plaintiffs' Motion for Summary Judgment, is a true and correct copy of such document, and should be admitted as evidence.

35. The parties stipulate that the Iron Workers Local Union 584 Joint Apprenticeship and Training Fund Restated Agreement and Declaration of Trust, previously filed with the Court as Exhibit 3, in Appendix to Plaintiffs' Motion for Summary Judgment, is a true and correct copy of such document, and should be admitted as evidence.

36. The parties stipulate that the Iron Workers Mid–South Pension Fund, Restated Agreement and Declaration of Trust, previously filed with the Court as Exhibit 4, in Appendix to Plaintiffs' Motion for Summary Judgment, is a true and correct copy of such document, and should be admitted as evidence.

37. The parties stipulate that the Oklahoma Iron Workers Direct Contribution Plan & Trust, Restated Agreement and Declaration of Trust, previously filed with the Court as Exhibit 5, in Appendix to Plaintiffs' Motion for Summary Judgment, is a true and correct copy of such document, and should be admitted as evidence.

38. The parties stipulate that the Collective Bargaining Agreements previously filed with the Court as Exhibit 6, in Appendix to Plaintiffs' Motion for Summary Judgment, are true and correct copies of such documents and should be admitted as evidence.

39. The parties stipulate that the contribution reports, previously filed with the Court as Exhibit 9, in Appendix to Plaintiffs' Motion for Summary Judgment, are true and correct copies of the contribution reports filed with Plaintiff Funds by Quality Home, and should be admitted as evidence.

40. The parties stipulate that the banking records of Quality Home, Simmons First Bank, previously filed with the Court as Exhibit 11, in Appendix to Plaintiffs' Motion for Summary Judgment, are true and correct copies of such records, and should be admitted as evidence.

41. The parties stipulate that the canceled checks of Quality Home, Simmons First Bank, previously filed with the Court as Exhibit 12, in Appendix to Plaintiffs' Motion for Summary Judgment, are true and correct copies of such canceled checks, and should be admitted as evidence.

The following facts are contained in the additional joint stipulation of facts filed on May 28, 2002:

1. The Welfare Plan is owed contributions in the amount of $21,325.95, accrued interest through May 3, 2002 in the amount of $8,296.02, liquidated damages in the amount of $2,132.62, for a total due of $31,754.59, with interest continuing to accrue at the rate of eighteen percent (18%) per annum.

2. The Pension Fund is owed contributions in the amount of $13,032.55, accrued interest through May 3, 2002 in the amount of $3,379.88, liquidated damages in the amount of $1,303.26, for a total due of $17,715.69, with interest continuing to accrue at the rate of twelve percent (12%) per annum.

3. The Direct Contribution Plan is owed contributions in the amount of $18,956.40, accrued interest through May 3, 2002 in the amount of

$7,374.25, liquidated damages in the amount of $1,895.64, for a total due of $28,226.29, with interest continuing to accrue at the rate of eighteen percent (18%) per annum.

4. The Apprenticeship Fund is owed contributions in the amount of $3,159.40, accrued interest through May 3, 2002 in the amount of $409.68, for a total due of $3,569.08, with interest continuing to accrue at the rate of six percent (6%) per annum.

Paragraphs one (1) through four (4) of the amended additional joint stipulation of facts filed on July 10, 2002 restate paragraphs one (1) through four (4) of the additional joint stipulation of facts filed on May 28, 2002. The following facts are the only additional facts contained in the amended additional joint stipulation of facts filed on July 10, 2002:

5. Plaintiff Oklahoma Iron Workers Apprenticeship & Training Fund is an employee welfare benefit plan subject to ERISA, pursuant to 29 U.S.C. § 1002(1).

6. The debt owed to Plaintiff Funds, as outlined in Numbers 1 through 4 above, a total of $81,265.65 (with interest accruing) represents the debt in controversy in this case, and is the amount which would be subject to exception from discharge pursuant to 11 U.S.C. § 523(a)(4).

7. For the time period November, 1999 through March, 2000, Quality Home Improvements deposited $709,959.98 in the corporate checking account. But for the payment of other obligations, this amount would have been available for payment of the amounts owed to Plaintiff Funds.

## IV. Conclusions of Law

■■■ Pursuant to 11 U.S.C. § 523(a)(4), a discharge under Chapter 7 of the Bankruptcy Code does not discharge an individual debtor from any debt for "defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). Defalcation is defined as the misappropriation of funds held by a fiduciary, and defalcation includes the "innocent default of a fiduciary who fails to account fully for money received." *International Fidelity Ins. Co. v. Herndon (In re Herndon)*, 277 B.R. 765, 768 (Bankr.E.D.Ark.2002) (citing *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997)). Cases interpreting "fiduciary capacity" have applied a narrow definition to the term—in order for a "fiduciary capacity" under the Bankruptcy Code to exist, the fiduciary duties must arise as the result of an express trust or through a statute or other state rule creating fiduciary status cognizable in bankruptcy. *Id.* (citing *Barclay's Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 878 (8th Cir.1985)). In order to obtain an exception for discharge for defalcation, a plaintiff has the burden to prove by a preponderance of the evidence that either an express or statutorily created trust exists, that the debtor owed a fiduciary duty arising from the trust, and that the debtor breached the duty through defalcation. *Id.* (citations omitted).

Plaintiffs allege that the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001–1461, created the requisite technical trust in this case, that Defendant owed fiduciary duties to Plaintiffs arising from the technical trust, and that Defendant breached those fiduciary duties through defalcation.

### A. *ERISA Creates a Technical Trust and Fiduciary Capacity Pursuant to § 523(a)(4).*

■■■ The issue whether a fiduciary relationship exists is a question of federal

law. *Id.* (citations omitted). Federal courts construing § 523(a)(4) agree that the fiduciary capacity must arise from an express or technical trust created prior to the defalcation and without reference to it. *Id.* Merely labeling a relationship a "trust" is insufficient to create fiduciary capacity under § 523(a)(4). Rather, "[i]t is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship." *Long,* 774 F.2d at 878–79.

■ As set forth in the Court's findings of fact, the parties do not dispute that the Welfare Plan, the Pension Fund, the Direct Contribution Plan, and the Apprenticeship Fund are all ERISA plans.[3] The Eighth Circuit has not analyzed whether ERISA creates a technical trust and fiduciary capacity under the Bankruptcy Code. The parties have cited, and the Court has reviewed, a number of cases analyzing the issue. There is a split of authority among the lower courts. The earliest cases held that ERISA fiduciaries are not fiduciaries under the Bankruptcy Code. *See In re Nielsen,* 53 B.R. 289 (Bankr.N.D.Ala.1985); *In re Bryant,* 73 B.R. 956 (Bankr.N.D.Tex. 1987). However, in recent years, the trend has shifted. Courts that have addressed the issue in the last eight years have held that a breach of the fiduciary duties imposed under ERISA falls within § 524(a)(4). *See In re Musgrove,* 187 B.R. 808 (Bankr.N.D.Ga.1995); *In re Eisenberg,* 189 B.R. 725 (Bankr.E.D.Wis.1995); *In re Coleman,* 231 B.R. 393 (Bankr.S.D.Ga. 1999); *Eavenson v. Ramey,* 243 B.R. 160 (N.D.Ga.1999). The Court holds that ERISA creates a technical trust and fiduciary capacity under the Bankruptcy Code.

■ In order to demonstrate that a statute creates a technical trust, a plaintiff must prove that: (1) the trust res is defined by the statute; (2) the statute spells out the fiduciary duty; and (3) the statute imposes a trust on funds prior to the act creating the debt. *In re Kelley,* 215 B.R. 468, 473 (10th Cir. BAP 1997). The Court holds that ERISA satisfies those three elements.

ERISA provides that:

A person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting the management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002. ERISA further provides that ERISA fiduciaries are required to exercise the prudent man standard of care and to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries. *Id.* § 1104(a).

In the case of an ERISA plan, the trust res is the welfare plan itself. *Eavenson,* 243 B.R. at 165. As set forth above, the statute spells out the fiduciary's duties. *Id.* Finally, the duties attach to the fiduciary at the creation of an ERISA plan, which satisfies the requirement that a fiduciary relationship must be shown to exist prior to the creation of the debt in controversy. *Id.* Accordingly, the Court holds that ERISA creates fiduciary duties that establish the elements required for the creation of a technical trust, and an ERISA fiducia-

---

**3.** See joint stipulations of fact at paragraphs 1, 5, 7, and 8 and amended additional joint stipulations of facts at paragraph 5.

ry acts in a fiduciary capacity as contemplated by § 523(a)(4).

## B. *Defendant Was a Fiduciary Under ERISA.*

 As set forth above, ERISA states that "a person is a fiduciary with respect to a plan to the extent he exercises ... any authority or control respecting management or disposition of [a plan's] assets ..." 29 U.S.C. § 1002(21). The Court concludes that the statute contains two elements: (1) that the alleged fiduciary exercises authority or control; and (2) that such authority or control is exercised with respect to plan assets.

### 1. *Defendant Exercised Control over the Alleged Plan Assets.*

 Fiduciary capacity exists where there is "a clear fiduciary duty on the part of corporate officers to a corporation with regard to the proper treatment of corporate assets over which the corporate officer has control." *In re Verhelst,* 170 B.R. 657, 661 (Bankr.W.D.Ark.1993) (citing *In re Collins,* 137 B.R. 754, 756 (Bankr.E.D.Ark.1992)). The following facts from the joint stipulation of facts clearly establish that Defendant exercised authority or control over the alleged plan assets:

17. Quality Home and Global were owned entirely and equally by Scott Manuel and David Philpott as sole shareholders.

18. Both Quality Home and Global were operated by two (2) corporate officers: David S. Philpott, President, and Scott Manuel, Vice President.

19. Philpott and Manuel were in charge of the day to day operations of Quality Home and Global, and both had the discretion to enter into contracts on behalf of the corporations.

20. Philpott and Manuel each had discretion to disburse corporate funds of Quality Home and Global and such decisions were made both individually and jointly.

24. David S. Philpott and Scott Manuel, as officers and sole shareholders of Quality Home and Global had the discretionary authority for the disbursement of corporate funds, including the obligation to remit contributions to the Plaintiff Funds owed on behalf of its employees.

The stipulated facts set forth above clearly establish that Defendant maintained discretion and control with respect to the funds that Plaintiff maintains were plan assets. However, Defendant cites two Eighth Circuit cases for the proposition that Defendant was not a fiduciary to the plans because Defendant allegedly did not have a pre-existing relationship to the underlying plans.

Defendant cites *Witt v. Allstate Insurance Co.,* 50 F.3d 536 (8th Cir.1995), for the proposition that merely having control of money that a plan purports to have a right to receive does not render the holder of the money a fiduciary of the plan. *Witt,* however, is fundamentally distinguishable from the facts of this case. In *Witt,* an ERISA plan sued the insurer of a third party tort-feasor for recovery of money paid to a plan participant and his son. The court, citing an Eleventh Circuit case, held that because the insurer of the third party tort-feasor had no pre-existing relationship to the plan, the insurer could not be classified as a fiduciary under ERISA. *Witt,* 50 F.3d at 537 (citing *Chapman v. Klemick,* 3 F.3d 1508 (11th Cir.1993)).

The facts of this case are antithetical to the facts of *Witt.* Defendant was not the insurer of a third party tort-feasor; rath-

er, he was the president and a director and stockholder of an employer that entered into collective bargaining agreements which imposed obligations to Plaintiffs. The collective bargaining agreements, and Defendant's relationship with Plaintiffs, arose before the alleged defalcation in this case. Therefore, the Court concludes that *Witt* is simply not applicable to the facts of this case.

Defendant also cites *Southern Council of Industrial Workers v. Ford*, 83 F.3d 966 (8th Cir.1996) in support of his position. *Southern Council* involved a suit by an ERISA plan to recover settlement proceeds pursuant to a subrogation clause in the plan documents. The suit was brought against an attorney who represented the beneficiary of the plan in an action against a third party tort-feasor. The Court held that the attorney's fiduciary obligation was to his client, and not the ERISA plan itself. To impose fiduciary liabilities on an attorney of a plan participant in such a case would result in an unacceptable conflict of interest. *Southern Council*, 83 F.3d at 968.

As with *Witt*, *Southern Council* is fundamentally distinguishable from the case at bar. In *Southern Council*, the alleged plan fiduciary was an attorney of a plan participant. In stark contrast, the alleged fiduciary in this case is the president and a director and stockholder of an employer that entered into collective bargaining agreements which imposed obligations to Plaintiffs. The Court concludes that the *Southern Council* holding is inapplicable to the facts of the case at bar.

Based on the stipulated facts before the Court, the Court concludes that Defendant was a fiduciary as to Plaintiffs.

### 2. *The Unpaid Contributions to Plaintiffs Constituted Plan Assets.*

██ The dispute in this case centers around unpaid employer contributions that were due Plaintiffs. The relevant facts are not in dispute, but the parties disagree over the following legal issue: do unpaid employer contributions to an ERISA plan constitute plan assets? The Court concludes that the unpaid employer contributions to Plaintiffs were plan assets within the meaning of ERISA.

The issue whether unpaid employer contributions constitute plan assets requires an analysis of the rights and obligations created by the underlying wage agreements to determine when the unpaid employer contributions became fund assets. *United States v. Panepinto*, 818 F.Supp. 48, 51 (E.D.N.Y.1993). The collective bargaining agreements at issue in this case provide as follows:

> The Employer will contribute to the Iron Workers Mid–South Pension Fund, the Mid–South Iron Workers Welfare Fund, either the Iron Workers Local No. 584 Joint Apprenticeship & Training Fund or the Iron Workers Western Oklahoma Area Joint Apprenticeship & Training, Fund, the National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund, the Oklahoma Iron Workers Direct Contribution Plan and Trust, the amounts shown below for each hour worked in employment covered by this Agreement by each of their employees employed within the jurisdiction of the Union. . . . All contributions payable shall be paid monthly on the dates and in the manner specified in the Rules and Regulations duly adopted by the Trustees of said Funds. Reports must be sent in by the 15th of the month following the month worked.[4]

**4.** See pp. 13–14 of the collective bargaining

agreements, which are located in the record

The collective bargaining agreements also provide that each iron worker was to be paid a total of $23.95 per hour worked, which consisted of $16.80 in wages, $2.70 to the Welfare Plan, $.38 to the local Apprenticeship Fund, $.02 to the National Apprenticeship Fund, $1.65 to the Pension Fund, and $2.40 to the Direct Contribution Plan.[5] There is nothing in the language of the collective bargaining agreements that makes the obligation to remit payments conditional or contingent. Once the employees worked the hours giving rise to the obligation to make the employer contributions, the obligation to pay constituted an "asset" of the Plaintiffs by any common definition of the term. *See United States v. LaBarbara*, 129 F.3d 81 (2d Cir.1997) (observing that an audit of the funds would include such fixed obligations as assets). The Court holds that the unpaid contributions were credits, property, or other assets of the Plaintiffs. *See Panepinto*, 818 F.Supp. at 51. Accordingly, Defendant had the fiduciary duty to ensure that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

### C. *Defendant Breached His Fiduciary Duties to Plaintiffs by Committing Defalcation.*

The term "defalcation" is not defined in the Bankruptcy Code. Case law defines defalcation as "failure to account for money or property that has been entrusted to one." *Hays v. Cummins (In re Cummins)*, 166 B.R. 338, 355 (Bankr.

as Exhibit 6 to Plaintiffs' motion for summary judgment and which were admitted into evidence pursuant paragraph 38 of the parties' joint stipulations of facts filed on March 20, 2002.

W.D.Ark.1994) (citing *In re Long*, 774 F.2d 875, 878 (8th Cir.1985); *Matter of Vickers*, 577 F.2d 683 (10th Cir.1978)). Defalcation is broader than fraud, embezzlement, or misappropriation. *Id.* (citing *Hash v. Reed (In re Reed)*, 155 B.R. 169, 172 (Bankr.S.D.Ohio 1993)). It is not necessary to show that a debtor received personal gain from the defalcation. *Id.* Accordingly, it is not a defense to a defalcation charge that a debtor did not personally profit from his actions. *Id.* As the *Cummins* Court observed, defalcation "is the slightest misconduct, and it may not involve misconduct at all. Indeed, negligence or ignorance may be defalcation." *Id.* As a bankruptcy court in Missouri stated:

> The term "defalcation," however, is construed to include liability arising through negligence, mistake, or innocent default. The fiduciary is held to objective standards even though laboring under subjective limitations, and he is chargeable with knowledge of the rules which forbid him to make certain expenditures even though he did not know of them.

*In re Wilson*, 127 B.R. 440, 443 (Bankr. E.D.Mo.1991).

The undisputed facts before the Court clearly establish that Defendant committed defalcation. Specifically, the joint stipulations of fact filed on March 20, 2002, establish the following facts:

22. No contributions were received from Quality Home or Global for the months of January and February, 2000, or for any months thereafter.

**5.** See footnote 1.

25. That during the period November 1999 through April 2000, cash withdrawals were made from the account of Quality Home and Global, the specific purposes of which are unknown.

26. During the period November 1999 through April 2000, the following disbursements were made from the corporate account:

(c) On December 12, 1999, Philpott issued check number 3461 on Quality Home's checking account, Simmons First Bank, for $150.00, payable to Westside Church of Christ, for the building fund;

(d) On February 18, 2000, Philpott issued check number 3991 on Quality Home's checking account, Simmons First Bank, for $172.77, payable to Southern Farm Bureau, for life insurance;

(e) On March 3, 2000, Philpott issued check number 4397 on Quality Home's checking account, Simmons First Bank, for $179.89, payable to First Security Bank, for the payment of a note securing the personal truck of Philpott;

(f) On November 11, 1999, Philpott issued check number 3267 on Quality Home's checking account, Simmons First Bank, for $350.00 payable to Simmons First, for "home loan."

27. During the period November 1999 through April 2000, Philpott and Manuel issued checks to themselves, on the Quality Home checking account, for various amounts in excess of $24,500.00.

28. But for the payment of other expenses of the corporation, Quality Home had funds to pay all or a portion of the contributions to the Funds.

29. Cash disbursements of corporate funds were made to David Philpott.

The amended additional joint stipulations of fact filed on May 28, 2002 state as follows:

7. For the time period November, 1999 through March, 2000, Quality Home Improvements deposited $709,959.98 in the corporate checking account. But for the payment of other obligations, this amount would have been available for payment of the amounts owed to Plaintiff Funds.

Thus, the parties have stipulated that no contributions to Plaintiffs were made on behalf of Quality Homes for January and February 2000 or thereafter, that Quality Homes had sufficient funds in its accounts to pay those contributions, that Defendant appropriated those funds to other obligations both corporate and personal, and that but for Defendant's failure to properly account for the funds and remit them to Plaintiffs, the funds would have been available for payment of the amounts owed to Plaintiffs. The Court concludes that these stipulated facts clearly establish a defalcation under § 523(a)(4).

B. *Damages*

The parties have stipulated to the damages at issue in this case as follows:

1. The Welfare Plan is owed contributions in the amount of $21,325.95, accrued interest through May 3, 2002 in the amount of $8,296.02, liquidated damages in the amount of $2,132.62, for a total due of $31,754.59, with interest continuing to accrue at the rate of eighteen percent (18%) per annum.

2. The Pension Fund is owed contributions in the amount of $13,032.55, accrued interest through May 3, 2002 in the amount of $3,379.88, liq-

uidated damages in the amount of $1,303.26, for a total due of $17,715.69, with interest continuing to accrue at the rate of twelve percent (12%) per annum.

3. The Direct Contribution Plan is owed contributions in the amount of $18,956.40, accrued interest through May 3, 2002 in the amount of $7,374.25, liquidated damages in the amount of $1,895.64, for a total due of $28,226.29, with interest continuing to accrue at the rate of eighteen percent (18%) per annum.

4. The Apprenticeship Fund is owed contributions in the amount of $3,159.40, accrued interest through May 3, 2002 in the amount of $409.68, for a total due of $3,569.08, with interest continuing to accrue at the rate of six percent (6%) per annum.

In addition, the amended additional joint stipulation of facts contained the following:

7. The debt owed to Plaintiff Funds, as outlined in Numbers 1 through 4 above, a total of $81,265.65 (with interest accruing) represents the debt in controversy in this case, and is the amount which would be subject to exception from discharge pursuant to 11 U.S.C. § 523(a)(4).

Based on the parties' stipulated damages, the Court concludes that Plaintiffs are entitled to a non-dischargeable judgment against Defendant in the amount of $84,471.67. This amount includes interest at the stipulated contract rate through July 29, 2002, the date of judgment. Interest shall continue to accrue at the federal judgment interest rate after the entry of judgment and until the debt is paid.

IT IS SO ORDERED.